JOSEPH SCHLEMMER v. THE STATE OF NEW JERSEY.

1. Where the mental condition of a defendant is part of the *res gestœ,* his conduct pertinent to the inquiry, being reasonably explanatory of it, is competent evidence in his own favor.
2. The defendant was charged by the state with sending a letter to decoy his wife into the street, he then having the intention to kill her; the proof on his side tended to show that he sought a meeting with her so that he might persuade her to again live with him. *Held,* that the defendant had the right to prove that after the sending of the letter, and about an hour before the homicide, he had made arrangements with a magistrate for him to issue, on the afternoon of the same day, or the next morning, process to take from the possession of his mother-in-law the clothes of his wife, on the ground that such conduct had a tendency to negative the state of mind imputed to him by the prosecution.

In error to Hudson Oyer and Terminer.

The plaintiff in error was indicted for the murder of Lillie Schlemmer, his wife, at Jersey City, at the September Term of the Court of Oyer and Terminer, 1887.

At the trial at the Hudson Oyer and Terminer the state offered testimony to show that shortly after half-past one o'clock in the afternoon of Monday, the 1st day of August,

1887, the deceased, with her sister, mother and grandmother, were met by the accused at the southwest corner of Erie and First streets, in Jersey City; that the prisoner there requested the mother of deceased to speak to him, but she refused; that he thereupon requested his wife to speak with him, but she also refused, saying, "Joe, I want nothing to do with you," and she immediately crossed Erie street to the southeast corner of Erie and First streets; that she was shortly afterwards followed by the prisoner, and at said last-mentioned corner was shot by the prisoner, and that she died in a few minutes after; that from the time the prisoner met deceased and her mother until the shooting, about two or three minutes elapsed; that half a minute or a minute after the shooting, the prisoner ran into a store on the last-mentioned corner, dropped a pistol on the floor, picked it up again and held it for half a minute, until disarmed and arrested.

The state offered testimony to show that the prisoner had, on the night following his arrest, attempted suicide at the police station by cutting his wrist with glass. The state further offered testimony to prove that the prisoner, previous to the shooting, had made threats against his wife. The testimony of Laura Nameby, offered for this purpose, was that six weeks before the shooting he had said that "if he couldn't have Lillie he would shoot her and then himself." The testimony of Charles P. Stier was that the prisoner, in July, 1887, had frequently watched for his wife, from out of a saloon opposite her mother's residence, and had once said " he would get square with her."

The state also showed that on the Saturday evening before the shooting the prisoner induced one David David to write a certain postal card in order to get the deceased out of her mother's house, and to come to said David's place of business at between three and four o'clock on Monday following; that deceased's mother received said postal card on the Monday following, and was with the deceased on her way to said David's at the time of said shooting.

The state also showed that the prisoner married deceased on

January 11th, 1887 ; that she was fourteen years of age ; that she lived, after her said marriage, with her mother, and not with her husband, and that, at the time of the marriage, he had agreed not to live with her as man and wife until she was of age.

The defence showed, by the testimony of the prisoner, that he and his wife had lived together as man and wife for a considerable time, and until about the beginning of July, 1887 ; that his wife was induced to return to her mother's house, and that afterwards he met her frequently outside of that home ; that the mother opposed their living together, but that both husband and wife had secretly agreed to live together in New York city, and there go housekeeping ; that at the suggestion of the deceased, the prisoner procured the postal card above mentioned to be written and sent same, in order to be able to meet, out of her mother's presence, his wife with her best clothing in her possession ; that, to the surprise of the prisoner, the deceased was accompanied by her mother when she started to go to David's, in accordance with request on the said postal card ; that having been repulsed in his effort to speak with either his wife or her mother, the prisoner, in a moment of despondency, attempted to shoot himself in the presence of his wife ; that she seized the pistol, or the hand in which he held it, to prevent him from so doing, and the pistol, being diverted by her and accidentally fired, the deceased was killed by bullet-wound, of the character above mentioned.

The defence further attempted to show, by Winfield S. Weed, that one hour previous to the shooting defendant was at the office of said Weed for the purpose of obtaining the clothes of his wife, with the aid of a constable, so that the prisoner and his wife might take same to their proposed place of housekeeping in New York ; which testimony was offered as bearing on the question of malice or intent at the time of meeting and shooting deceased, and as rebutting the testimony on the part of, and insistment of, the state, that the prisoner had, at the time of sending the postal card aforesaid, designed the shooting or killing of the deceased ; the exclusion of which testimony of

said Winfield S. Weed, is one of the assignments of error relied upon by counsel of plaintiff in error for reversal of the judgment in this case.

The defence, on the trial, attempted to prove that the prisoner had a great and strong affection for the deceased, before, at the time, and after his marriage to her, and until the time of her death. This testimony was offered as bearing upon the question of malice, and as showing, or tending to show, the absence of motive; part of which testimony so offered was excluded by the court, and to which exclusion prisoner's counsel took exception, and which exclusion of testimony of said witnesses is ground of error in this case.

Argued at June Term, 1888, before BEASLEY, CHIEF JUSTICE, and Justices KNAPP, MAGIE and GARRISON.

For the plaintiff in error, *William D. Daly.*

For the state, *Chas. H. Winfield, Prosecutor of the Pleas.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. It will appear from the narration of facts prefacing this opinion that at the trial the state not only proved the act of homicide charged in the indictment against the defendant, but likewise adduced testimony tending to show certain preparations made by him for the accomplishment of his crime.

The defendant, it was alleged, had shot his wife with malice aforethought; his defence was, that her death had resulted from an accidental discharge of his pistol.

To meet this contention, and to show that the killing was premeditated, and had been effected through a concerted plan of action, the prosecution proved this train of circumstances, viz.: that the defendant had armed himself with a loaded pistol; that he had repeatedly threatened to take the life of the deceased; that he had procured a third person to write to the mother of his wife, with whom she was living, inviting

her, the wife, to call at the house of the writer, under the pretext that he wished to engage her to do some work ; that being on her way, at the time appointed, in pursuance of this invitation, she was met by the defendant, and who, upon her refusal to hold any intercourse with him, immediately shot and killed her.

It thus appears that it was the contention, on the part of the state, that the defendant, by means of the illusive letter referred to, had sought to gain access to his wife with the intent to kill her.

On his part he denied, on the witness stand, the existence of any such intent, but insisted that his mother-in-law had separated himself and his wife, and that his purpose in resorting to the stratagem of the letter was to enable him to meet the deceased, so that he might induce her to again cohabit with him.

It will be observed, therefore, that the state and the defendant were at issue on the question as to the intention of the defendant in seeking to meet his wife at the time in question.

For the purpose of showing that he was not seeking his wife in order to kill her, but that his version of the affair was the true one, an offer was made in his behalf to prove that on the day in question, and about an hour before the homicide, he had applied to a justice of the peace for legal process whereby he could take the clothes of his wife from the possession of her mother ; and that it was arranged that he should call for such process in the afternoon of that day or the next morning.   It was insisted that such conduct was consistent with the theory of the defence, but not with that of the state with respect to the intention of the defendant in contriving to meet his wife ; that if his purpose was to again cohabit with her, he would naturally endeavor to get her clothing, but not so if he meant to take her life.

To substantiate this offer the justice of the peace was called as a witness, but, on objection in behalf of the state, the testimony was rejected.

Upon consideration it is conceived that the step thus taken was erroneous.

The question touching the intention of the defendant in seeking to meet the deceased was plainly part of the *res gestœ*, and neither the state nor the defence could manifest what such intention was except by showing what the conduct of the defendant had been. As a state of mind is inscrutable to the direct perception of the senses, resort must, of necessity, be had, when it is in question, to its manifestations as exhibited in words and acts; and consequently the legal rule is, that all conduct that is reasonably evincive of such mental condition is admissible in evidence. In such cases it is not part of a man's conduct but the whole of his conduct, having this explanatory efficacy, which may be used either for or against him. In such inquiries, to receive proof of acts done by a man, as a reasonable basis for inference as to the condition of his mind at a certain period, and to reject other parts of his conduct also reasonably reliable for the purpose, would be to put the law in the condition of requiring its conclusions to be drawn from imperfect inductions. To illustrate by the facts of the case before the court: the state proved the conduct of the defendant as indicative of an existing intention to commit murder; that he provided himself with a loaded pistol; that he contrived the illusive letter, and that his purpose was to put into effect his homicidal design by means of that snare. Was it not competent for the defendant to show other parts of his conduct, that would have a fair tendency to evince a different mental state from that which the circumstances proved appeared to indicate? Could he not prove that, instead of getting the pistol with the object of slaying his wife, that he had carried it to protect himself from some violence threatened to his person; that with respect to the illusive letter, in point of fact, he had arranged that some other person should meet her, and that, such plan failing, he had met her by pure accident? It seems obvious that such acts of the defendant, if they had been performed by him, would have been not only competent as legal evidence, but absolutely essential to a correct conclu-

sion as to the condition of his mind at the period to which the inquiry pointed. And yet, none of such supposed acts were more essential, as indications of mental condition, than was the fact the proof of which was rejected. It is certain that the evidence that was deemed inadmissible tended strongly to show that the intention to murder, in an absolute form, was not present to the mind of the defendant when the illusive letter was sent. In the absence of such proof, the irresistible inference was that he then had a fixed and unconditional design to perpetrate the murder.

The testimony overruled was admissible, and, as it was essential to a proper trial on the merits of the case, the judgment cannot stand.

The decisions are plainly in harmony with the view of the law above expressed.

The rule exemplified by the authorities is this : that whenever the existence of a purpose, or state of mind, is the subject of inquiry, explanatory conduct and accompanying expressions of the party himself, or of other persons to him or in his presence, may be shown by proof. Thus, in the case of *State* v. *Hunter*, 11 *Vroom* 495, it was declared by the Court of Errors that the declarations of a third party explanatory of an act that was part of the *res gestæ* were not hearsay but were legitimate evidence.

In the recent case of *People* v. *Dowling*, 84 *N. Y.* 478, which was a prosecution for receiving stolen goods, after the state had proved the receipt of the goods, the defendant, in order to rebut the inference of guilty knowledge on his part, offered to show what statement the thief had made to him at the time he purchased the property, with respect to the source from which he had got it ; and such statements were held competent evidence by the Court of Appeals.

An application of the same principle appears in the case of *Rex* v. *Whitehead*, 1 *Car. & P.* 67, and reference to other like cases will be found in the text-books. *Whart. Crim. Ev.*, § 262 *et seq. ;* 1 *Greenl. Ev.* 185, notes.

Let the judgment be reversed.