19 A.3d 985

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ZARIK ROSE, DEFENDANT–APPELLANT.

Argued January 4, 2011—Decided June 8, 2011.

144 

———————

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segar,* Public Defender, attorney).

*Frank Muroski,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Mr. Muroski, Robyn B. Mitchell,* Deputy Attorney General, and *Ashlea D. Thomas,* Special Deputy Attorney General, of counsel and on the briefs).

*Alison S. Perrone* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey.

Justice LaVECCHIA delivered the opinion of the Court.

Defendant Zarik Rose was convicted, as an accomplice, of the purposeful murder of Charles Mosley. The State's theory at trial was that defendant arranged for the murder while in jail and about to go to trial on earlier charges that he had attempted to murder the victim. In this appeal, we address whether evidence of defendant's previous indictment and incarceration on the pending attempted murder charges was admissible in defendant's trial for murder.

The disputed evidence was introduced at trial through several sources, two of which deserve to be highlighted. Larry Graves testified that, while he and defendant were in jail together and Graves's release date was approaching, defendant solicited him to kill Mosley. In fact, Graves pled guilty to aggravated manslaughter for killing Mosley and, pursuant to his agreement with the State, testified against defendant. Salvatore Puglia, who also met defendant while the two were in jail, testified that defendant had mentioned having Mosley "whacked" or making sure he did not testify in connection with the pending attempted murder charge against defendant. The State's evidence about defendant's pending indictment for attempted murder of Mosley, addressed through the anticipated testimony of Puglia and Graves, was reviewed pretrial by the trial court and declared admissible. The court determined that Graves's testimony was admissible as res gestae, but circumspectly provided the jury with a limiting instruction about the use of the evidence. As for Puglia's testimony, the trial court analyzed it under the rubric of *New Jersey Rule of Evidence* 404(b), found that it was not evidence of another crime but rather was evidence that involved this crime, and admitted the testimony after concluding that its probative value was not outweighed by its prejudicial effect. The court again provided a limiting instruction to channel the jury's use of that evidence. During the trial, defendant stipulated to the admission of a copy of his indictment on the attempted murder charges.

Defendant was convicted of purposeful murder and, on appeal, the Appellate Division affirmed. However, in specifically finding no error in the admission of the disputed evidence, the panel engaged in a fundamentally different analysis based on *Evidence Rules* 401 and 403. We issued a limited grant of certification, *State v. Rose*, 203 *N.J.* 96, 999 *A.*2d 465 (2010), to address only the admissibility of the evidence pertaining to defendant's prior indictment and incarceration on charges that he attempted to murder the victim, and now affirm the judgment of the Appellate Division. We conclude that the disputed evidence was admissible under a straightforward application of *Evidence Rule* 404(b). The evidence went to non-propensity purposes, chiefly motive, but also plan and intent by defendant, and the trial court provided instructions that properly limited the jury's use of the evidence to those legitimate purposes.

That said, the various positions taken by counsel, the trial court, and the Appellate Division on how to analyze the disputed evidence relating to defendant's previous indictment on charges for the attempted murder of the victim, demonstrate that there exists confusion and uncertainty about use of the common law doctrine of res gestae and its status as a viable feature of New Jersey's evidence jurisprudence. Accordingly, we address in this appeal the continued invocation of res gestae as an explanation for the admission of evidence, and hold that the doctrine of res gestae no longer has vitality in light of the formal *Rules of Evidence.*

## I.

To set the stage for our review of the evidential rulings in issue, we begin with a recitation of the facts involved in the criminal charges against defendant.

## A.

In 1995, defendant was incarcerated on charges relating to the attempted murder of Charles Mosley, the murder victim in the

present appeal. While in jail, defendant met Puglia,[1] and ex-plained to him that he and Mosley had an altercation over $1,500 that Mosley owed him. According to Puglia, defendant told him that during that altercation "one thing led to another" and that Mosley subsequently "pressed some serious charges" against de-fendant that defendant felt were "overinflated." Defendant told Puglia that he did not want Mosley to appear as a witness against him at trial and that "plan A was to pay [Mosley] off and plan B was to get him whacked."

In the fall of 1997, while still in jail awaiting trial on the attempted murder charges, defendant became acquainted with Graves, a fellow inmate. According to Graves, defendant told him on several occasions that he needed Mosley killed because his trial was scheduled to start on December 1, and Mosley was to be the prosecution's key witness. When Graves informed defendant that he was soon to be released from jail, defendant propositioned him: if Graves would kill Mosley, defendant would give him $2,000 to $3,000 and a quantity of drugs.

Graves agreed, so defendant conveyed pertinent details about Mosley: defendant gave him Mosley's telephone number and address in Franklinville, New Jersey, and told him that Mosley sold automobiles from his home. They planned to have Graves express interest in a truck with an automatic lift, use that interest to gain entrance into an office located at the front of Mosley's house, and then kill Mosley. Defendant also warned Graves that Mosley kept guns in his house. They further agreed that after the deed was done, Graves would inform defendant whether he had "sold the car," which was code for having killed Mosley.

When Graves was released from jail on November 19, 1997, he went to his step-mother's home in Glassboro, and from there, took

---

[1] The State's brief and the Appellate Division's opinion refer to him as Salvatore Puglio; however, defendant's brief refers to him as Salvatore Puglia and according to the transcript that is also the spelling Mr. Puglia provided at the pre-trial hearing. Accordingly, we use the spelling obtained from the transcript of the pre-trial hearing.

a bus to Franklinville the next day. When he arrived at Mosley's house, he found no one home, and his attempts to contact Mosley by telephone were unsuccessful. That night, defendant placed a collect call to Graves and asked whether Graves had "sold the car," to which Graves responded that he had not, but that he planned to return to Mosley's the following day. Graves returned to Mosley's home the next day; again no one was home, but this time Graves managed to contact Mosley by phone. That night, defendant again called Graves and asked whether he had "sold the car." When Graves responded in the negative, defendant sounded a "little bit . . . worried"; he instructed Graves to return the following day.

Graves returned the next day for a third time and found Mosley at home. He told Mosley that he wanted to speak with him about a truck and was invited into Mosley's office. As the conversation progressed, Mosley seemingly grew suspicious of Graves. Mosley pointed to a cracked window, told Graves that someone had tried to break into his house, and that individual was now "in the cemetery." Graves grew "uneasy" and "uncomfortable" and rose to leave, having changed his mind about carrying out the plan. As he walked towards the door, Graves "mentioned something about [defendant]," at which point Mosley "jumped up and grabbed a crowbar or a lug wrench" from the side of his desk and swung it at Graves. Graves managed to dodge the object, grab Mosley, and the two began to wrestle. Graves gained control of the object and used it to strike Mosley in the head. Graves then choked Mosley until he appeared to be dead. Graves took a "few hundred dollars" from Mosley's wallet and searched the house for weapons, but came up empty-handed. That night, Graves received another call from defendant, whom he told that he had "sold the car." [2]

As a result of Mosley's death, the charges against defendant were dropped in December 1997, and he was released from jail.

---

[2] Telephone records confirmed that collect calls were placed from the jail to Graves's step-mother's house on November 20, 21, and 22.

He went to Graves's house, thanked him, and told him that he would get the money to pay him soon, but he never actually paid Graves. Defendant also cautioned Graves not to tell anyone about what had happened.

Although police suspected that defendant was involved in Mosley's death, they were unable, initially, to connect him to the murder. The only forensic evidence that the police collected was a fingerprint that did not produce any matches when entered into the Automated Fingerprint Identification System.

However, a few months later, an undercover sting operation led to Puglia's arrest for distribution of marijuana.[3] The officers who interviewed Puglia believed that he would be able to help them connect defendant to Mosley's death. Puglia agreed to wear a "wire" to record his conversations with defendant[4] and a consensual intercept authorization was obtained from the prosecutor's office. Detective Danielle Lorusso, acting undercover as Puglia's girlfriend, drove Puglia and defendant around. On February 8, 1998, when Puglia spoke with defendant about having someone who had set him up killed, defendant cryptically referenced his situation with Mosley a few times, including the following recorded exchange:

[Puglia]: That pussy was talking s* *t last night man.

[Defendant]: Yo, I mean it won't even cost you that much to get him (indiscernible).

[Puglia]: To get him f* *ked up.

[Defendant]: Oh just, I mean I don't think you gonna, it's really not worth killing them, but I mean it, with me it was either, it was a life or death situation, it was either my life all that time behind bars . . .

[Puglia]: What'd they offer you[?]

[Defendant]: Or his life. Twenty years man.

_____

[3] It is unclear whether defendant had cooperated with police in the sting operation that led to Puglia's arrest, whether police made Puglia believe that defendant had set him up, or whether Puglia himself independently believed that to be the case.

[4] The benefit that Puglia received in exchange for his cooperation is uncertain.

[Puglia]: Oh twenty years?

[Defendant]: Yeah.

[Puglia]: Not twenty stip?

[Defendant]: No ten stip. Come on man what the, what the f* *k, you know, what, (indiscernible) gonna be and my daughter would have been nineteen years old when I got out. F* *k that.

[Puglia]: God damn.

[Defendant]: Ain't no f* *king way in hell, f* *k him, he, he got exactly what he deserves.

The following week, as Detective Lorusso was driving Puglia and defendant, she passed by Mosley's house and defendant gave Puglia a "thumbs up sign." A few days later she again drove them past the house and this time defendant "performed a digging motion like he was shoveling" and again gave a "thumbs up sign."

A warrant was issued for defendant's arrest on charges of conspiracy to commit assault.[5] He was arrested on February 20, 1998 and informed of his *Miranda*[6] rights, which he waived. Eventually, defendant gave a videotaped statement in which he discussed Mosley's murder, but denied any involvement. Defendant stated that shortly after he was released from jail a "friend" whom he met in jail stopped by his mother's house. The friend, who defendant claimed knew Mosley from prior drug transactions, told defendant that he had gone to Mosley's house and had robbed and killed Mosley. The friend said that he had choked Mosley and then searched the house for money and jewelry, taking over $1,000. The friend thought that he was doing defendant a favor because of the attempted murder charges that defendant was facing. Defendant told his friend that he made "a big mistake" and "endangered" both of them by killing Mosley, but assured his friend that he would keep quiet.

---

[5] The record is not clear whether the warrant was issued in relation to defendant's conversations with Puglia about the individual who had allegedly set up Puglia or in relation to Mosley's murder.

[6] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

When defendant was asked who his "friend" was, he replied that his friend's nickname was "Zboo" and that his real name was Larry Brooks. It was soon discovered that defendant was mistaken and defendant confirmed that the friend's name was actually Larry Graves. Defendant stated that he did not know where Graves lived, but that he had Graves's phone number and pager number at his mother's house. Defendant told the officers that he was willing to wear a wire and to talk to Graves in an effort to confirm his version of events. A consensual intercept authorization was obtained that night and defendant was driven to his mother's house so that he could get Graves's phone and pager numbers. Defendant was allowed to enter the house alone. He did not come out. Police searched the house to no avail; they discovered his body wire discarded in the backyard.

On February 28, 1998, an expert compared the fingerprint found at the scene of Mosley's murder to Graves's fingerprints and confirmed that it was a match for Graves's right thumb. Despite the match, Graves was not arrested until seven years later, on March 3, 2005. Police interviewed him twice; both were taped. During the first interview Graves denied killing Mosley. However, when confronted with the fact that his fingerprint was found at the murder scene and shown the videotaped statement that defendant had given implicating him in Mosley's murder, Graves admitted that he had killed Mosley and informed the police about defendant's involvement. Graves stated that he had gone to Mosley's house to make Mosley drop the charges against defendant and that he was not planning on killing Mosley. Graves eventually pled guilty to aggravated manslaughter in exchange for the recommendation of a sentence between twenty-five and thirty years of imprisonment, with an eighty-five percent period of parole ineligibility. As a condition of his plea, Graves had to testify against defendant, and his sentencing hearing was still pending at the time of defendant's trial.

On March 9, 2005, police learned that defendant had been arrested in Vineland on outstanding warrants. Defendant was

interviewed and denied knowing Graves, claiming that he did not remember providing a taped statement to police in 1998 implicating Graves in Mosley's murder.

## B.

A Gloucester County grand jury indicted defendant on charges that he was an accomplice to purposeful murder, *N.J.S.A.* 2C:11–3(a)(1) and 2C:2–6, and to felony murder, *N.J.S.A.* 2C:11–3(a)(3) and 2C:2–6. A pretrial *Rule* 104 hearing was held on January 23, 24, and 25, 2007, in which defendant challenged the admissibility of: (1) his videotaped statement to police; (2) proposed testimony by Graves and Puglia of their discussions with defendant about Mosley while each was in jail; and (3) the surveillance audio tapes recorded when Puglia was wearing a wire. The motion court determined that: (1) defendant knowingly and intelligently waived his *Miranda* rights and that his videotaped statement was therefore admissible; (2) defendant's discussions with Graves and Puglia about having Mosley killed were admissible; and (3) some portions of the surveillance tapes were admissible.

At trial, defendant did not testify or call any witnesses on his behalf. His trial strategy, as he argued on appeal, was that he

had merely asked Graves to try to persuade Mosley to drop the charges against him; that Graves had intended to do nothing more, but had killed Mosley in self-defense when Mosley had attacked him with a tire iron; that any of defendant's statements to Puglia that suggested otherwise represented mere "talk," and were not credible; and that Graves had falsely implicated defendant in order to get the benefit of a favorable plea bargain.

The jury convicted defendant of being an accomplice to purposeful murder and an accomplice to felony murder. At sentencing, the court merged defendant's felony murder conviction into his conviction for purposeful murder and granted the State's motion to sentence defendant to an extended term as a persistent offender under *N.J.S.A.* 2C:44–3(a).[7] The court sentenced him to forty-

---

[7] Defendant had forty-two prior arrests and eighty prior charges against him. He had seventeen prior municipal court convictions and nine prior Superior

five years in prison with a thirty-five year period of parole ineligibility.

On appeal, defendant raised three arguments: (1) that, in general, all evidence relating to the fact that he was incarcerated on charges of the attempted murder of Mosley when Mosley was killed was improperly admitted; (2) that the jury charge should have included accomplice to aggravated manslaughter, a lesser-included offense of murder;[8] and (3) that his motion for an acquittal on the felony murder charges was improperly denied because there was no rational basis for finding him guilty of felony murder. The Appellate Division rejected defendant's arguments, and affirmed his conviction and sentence.

## C.

Because the limited grant of certification in this appeal focuses on the evidential rulings, the details of the *Rule* 104 hearing require elucidation, as do the trial court's and the Appellate Division's analytic approaches to the disputed evidence.

At the *Rule* 104 hearing, defense counsel argued that allowing Graves and Puglia to testify about their conversations would unduly prejudice defendant because it would require him to defend not only the current charges concerning the murder of Mosley, but also the earlier charge of attempted murder of Mosley because that was the reason that defendant was in jail and ostensibly had Mosley killed. Counsel also raised the applicability of *Rule* 404(b), arguing that it should require exclusion of the evidence.

The prosecutor argued in response as follows:

_____

Court convictions that resulted in six state prison terms with two parole violations, three terms of probation, fifteen county jail terms, and three suspended county jail terms.

[8] Defendant also filed handwritten pro se supplemental briefs in support of this argument.

The other issues with 404–B before the Court were the discussions, which Mr. Puglia begrudgingly testified to from the stand, that he had with Mr. Rose in jail about having the guy not show up either by paying him off by or having him whacked.

The prior Indictment that was marked, I would submit, goes to motive.

. . . .

The other 404–B—I don't even know if it's 404–B but it's just a—it's just planning. There's Mr. Graves' testimony. There are jail records at some point, which would be proffered, to corroborate housing situations with he and—with Mr. Graves and Mr. Rose, as well as Mr. Rose and Mr. Puglia.

. . . .

Mr. Puglia was brought in to give context to that and to discuss background, as far as he and Mr. Rose. How he knew him, et cetera. But also to discuss prior discussions that he had with Mr. Rose, although they were I guess the summer before '96.

So I would submit under either a motive analysis, planning and intent analysis and as I said in my case, the res [gestae] analysis, which I'm not real big on—I guess that's Latin. I don't know. But it basically talks about all these things come from the same cloth.

That you can't just take a piece out because it's part of the mosaic of the events that took place here and that's what this is. I mean, this whole case is going to be a mosaic of people coming in and they're saying their bits and pieces as to what they know about this. And what this hearing this week was, was a couple of the pieces of the mosaic.

And to say that they aren't relevant or aren't pertinent under *Cofield*,[9] I think is incorrect, as I stated in my Brief for the reasons I stated in my Brief. They are relevant. They are pertinent. They do explain issues such as motive. Whether it's believed or not is a jury issue.

They do explain motives like intent. They do explain issues of planning. They do explain issues of how these witnesses know each other. And under *Cofield*, I think it satisfies all the prongs of *Cofield*, as was previously set forth in my Brief, which I'm not going to sit here and reread that to the Court.

But for 404–B, those were the items that I sought to admit and those were the reasons that they were sought to be admitted. And I think that they're properly presented to the Court and they're properly relevant and properly admissible.

The trial court placed an oral decision on the record, reasoning that the proposed testimony of

Graves, concerning the killing of Mr. Mosley and the reason therefore, does directly relate to the commission of the crime charged in the Indictment.

And I don't find 404 applies to that. That's—res [gestae], as Mr. Gangloff said, is a term that is used. I know when I was in law school, I thought we were told

---

9 *State v. Cofield*, 127 *N.J.* 328, 605 A.2d 230 (1992).

that res [gestae], you shouldn't use that with regard to evidence. You should find a real rule that applies and that was kind of general language.

But it seems back in the case law and basically talks about, as I read it, as being part of the crime itself. It's so woven into that that it needs to be part of the evidence. That the 404-B analysis doesn't really apply. And I find that with regard to Mr. Graves' testimony regarding what happened in the jail.

A different question arises, a slightly different question with regard to Mr. Puglia's testimony of the discussions in jail by the Defendant. Mr. Graves alleges he was solicited. Mr. Puglia wasn't solicited. There were merely conversations in the jail regarding this.

And I do find that a 404-B type of analysis would come into play with regard to that in a sense. Although it is evidence frankly not of another crime, which is one of the *Cofield* factors. Is the evidence of the other crime must be admissible as relevant to a material issue.

There really is evidence of this crime, evidence to show motive and intent and plan and so forth. So there are items under 404-B that clearly relate to this evidence, although it isn't a traditional 404-B type of evidence because it isn't evidence of a different crime. It's evidence of this crime.

So the—as I said, the 404-B analysis—type analysis applies but I don't find it's really 404-B material in any event. The question would be whether the evidence under 403, its probative value would be substantially outweighed by the other factors. And I find that it would not . . .

At trial, defendant stipulated to the admission of a copy of his prior indictment for attempted murder. Puglia and Graves testified in accordance with the court's ruling from the *Rule* 104 hearing. Defense counsel did not object to the testimony by either Puglia or Graves. Nonetheless, the trial court repeatedly provided the jury with limiting instructions about its use of the evidence. When the jury first learned that defendant was incarcerated on charges of the attempted murder of Mosley when Mosley was killed, the trial court instructed the jury, in part, that

you may not use this evidence to decide that the Defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the Defendant . . . had charges pending against him, or was incarcerated in the County Jail, that he must be guilty of the present crime.

Admitted—I have admitted the evidence only to help you decide the specific question of his knowledge of what happened or his motive and/or intent to have Mr. Mosley killed and/or his formulation of a plan to have him killed.

You may not consider it for any other purpose and may not find the Defendant guilty simply because the State has offered evidence that he has committed other crimes, wrongs or acts.

That charge was given again following Puglia's testimony and as part of the final jury charge. The trial court also provided a limiting instruction after Graves testified, informing the jurors that they

> may not use this evidence to decide that the Defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because he was in jail, he must be guilty of the present crime.
>
> I have admitted the evidence only to provide you with the location of the discussions, to assist you in your understanding of the context and background of them. You may not consider it for any other purpose and may not find the Defendant guilty now simply because the State has offered evidence that he was incarcerated in the County Jail at any time.

That instruction also was repeated during the final jury charge.

In his appeal to the Appellate Division and to this Court, defendant has characterized his arguments at the *Rule* 104 hearing as constituting "generalized objections" to the introduction of any evidence during trial that related to the fact that he was incarcerated on an indictment charging him with the attempted murder of Mosley when Mosley was killed. The Appellate Division rejected that proposition, stating that "[c]ounsel was obligated to announce an objection when any offending material was offered during the trial." Because defendant did not object to either Puglia's or Graves's testimony at trial, and stipulated to the introduction of a copy of his indictment, the panel concluded that the plain error standard applied. *See R.* 2:10–2. In rejecting defendant's argument about the evidence's inadmissibility, the panel reasoned that defendant's failure to object deprived the trial court of the "opportunity to determine: whether the vehicle used to convey those facts was proper; whether the evidence should have been precluded by application of *N.J.R.E.* 403; or whether, despite its admissibility, the prejudicial impact of evidence of the prior indictment could have been lessened by an appropriate jury instruction."

In pertinent part, the panel explained that

> [d]efendant has spent a good deal of energy in arguing against the application of *N.J.R.E.* 404(b) and the so-called *res gestae* doctrine as they may relate to evidence of the prior indictment. But, as we have observed, the evidence specifically noticed

in the appeal brief was properly admitted without reference to either *N.J.R.E.* 404(b) or *res gestae*.

Neither the Pugli[a] testimony nor the stipulated prior indictment was offered to show that defendant had engaged in prior bad acts, as the judge properly held in his oral decision at the conclusion of the *N.J.R.E.* 104 hearing. This evidence, insofar as it revealed the existence of the prior indictment, was only offered to prove what was relevant—that defendant had been charged and that Mosley was a material witness against him, two facts that suggested defendant's motive in participating in Mosley's murder.

And, although the judge expressly relied on the *res gestae* doctrine to permit evidence of the prior indictment, we do not find that questionable rationale to have any bearing upon the issues presented on appeal. That is, we discern from the trial judge's ruling that he viewed evidence relating to the prior indictment as tending to show defendant's motive; such a ruling is fully supported by *N.J.R.E.* 401 and does not require reliance upon the *res gestae* doctrine, which may or may not lurk among the interstices of our rules of evidence.

Defendant petitioned for certification to this Court, reasserting the same issues raised before the Appellate Division; however, our grant of certification was "limited to the issue of whether evidence that defendant was previously indicted and incarcerated on charges that he attempted to murder the victim was admissible at defendant's trial pursuant to *N.J.R.E.* 404(b), *res gestae*, or some other legal doctrine." *Rose, supra*, 203 *N.J.* at 96, 999 *A.2d* 465. Accordingly, we turn to address the admissibility of the disputed evidence.

## II.

### A.

A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion. *See Brenman v. Demello*, 191 *N.J.* 18, 31, 921 *A.2d* 1110 (2007). However, if the party appealing did not make its objection to admission known to the trial court, the reviewing court will review for plain error, only reversing if the error is "clearly capable of producing an unjust result." *R.* 2:10–2.

When specifically reviewing the sensitive admissibility rulings made pursuant to the weighing process demanded by *Rule* 404(b), which deals with evidence of other crimes or bad acts, we have

further said that "[o]nly where there is a clear error of judgment should the trial court's conclusion with respect to that balancing test be disturbed." *State v. Barden*, 195 *N.J.* 375, 391, 949 *A.*2d 820 (2008) (citation and internal quotation marks omitted). That deferential approach does not fit in cases where the trial court did not apply *Rule* 404(b) properly to the evidence at trial; in those circumstances, to assess whether admission of the evidence was appropriate, an appellate court may engage in its own "plenary review" to determine its admissibility. *Ibid.* (citation omitted); *see State v. Lykes*, 192 *N.J.* 519, 534, 933 *A.*2d 1274 (2007) (citing *State v. Reddish*, 181 *N.J.* 553, 609, 859 *A.*2d 1173 (2004), for proposition that appellate review is de novo when *Cofield* analysis is required but not performed).

Here, with respect to the admission of defendant's indictment, defendant interposed no objection. He stipulated to its admission at trial. Nor did he object to Puglia's and Graves's testimony at trial. The Appellate Division did not accept defendant's "generalized objection" argument about that evidence. That said, under the standard for reviewing evidence of other crimes or acts, an appellate body is permitted to perform its own plenary review of the evidence to determine whether the evidence was properly admitted. *Barden, supra,* 195 *N.J.* at 391, 949 *A.*2d 820. Here, a straightforward application of *Rule* 404(b) leads to the conclusion that defendant suffered no error due to the admission of the disputed evidence about his former indictment (and incarceration pending trial) on charges that he had attempted the murder of the victim in his present trial.

## B.

 *Rule* 404(b) provides that

evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[*N.J.R.E.* 404(b). ]

"The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is a bad person in general." *State v. Cofield*, 127 *N.J.* 328, 336, 605 *A.2d* 230 (1992) (citation and internal quotation marks omitted). Thus, "the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial." *Id.* at 335–36, 605 *A.2d* 230 (quoting 1 *McCormick on Evidence* § 190, at 798 (Strong ed., 4th ed.1992) (footnotes omitted)).

*Rule* 404(b) "seeks to strike a balance between the prejudice to a defendant that is inherent in other-crimes evidence and the recognition that the evidence may be highly relevant to prove a defendant's guilt of the crime charged." *Barden, supra,* 195 *N.J.* at 388, 949 *A.2d* 820. Thus, evidence of uncharged misconduct would be inadmissible if offered solely to prove the defendant's criminal disposition, but if that misconduct evidence is material to a non-propensity purpose such as those listed in *Rule* 404(b), it may be admissible if its probative value is not outweighed by the risk of prejudice. *See ibid.*

The seminal case in New Jersey on the proper application of *Rule* 404(b) to evidence of uncharged misconduct is *State v. Cofield.*[10] In *Cofield, supra,* the Court articulated the following four-part test to determine if evidence of uncharged misconduct is admissible at trial:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

---

[10] *Cofield* addressed application of *Rule* 404(b)'s predecessor, *New Jersey Evidence Rule* 55. *Cofield, supra,* 127 *N.J.* at 330, 605 A.2d 230. The two *Rules* contain substantially similar language, and the test articulated in *Cofield* still frames the analysis for the admissibility of evidence under *Rule* 404(b). *See, e.g., State v. P.S.,* 202 *N.J.* 232, 254–55, 997 A.2d 163 (2010); *Barden, supra,* 195 *N.J.* at 388–89, 949 A.2d 820.

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 *N.J.* at 338, 605 *A.*2d 230 (quoting Abraham P. Ordover, *Balancing The Presumptions Of Guilt And Innocence: Rules 404(b), 608(b), And 609(a),* 38 *Emory L.J.* 135, 160 (1989) (footnote omitted)).]

■ To satisfy the first prong of the *Cofield* test—the relevancy prong—the evidence must have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *See N.J.R.E.* 401 (defining "relevant evidence"). "The standard for the requisite connection is generous: if the evidence makes a desired inference more probable than it would be if the evidence were not admitted, then the required logical connection has been satisfied." *State v. Williams,* 190 *N.J.* 114, 123, 919 *A.*2d 90 (2007). The evidence must also bear on a material issue in dispute, such as motive, intent, or an element of the charged offense, and so "the Court should consider whether the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede." *State v. P.S.,* 202 *N.J.* 232, 256, 997 *A.*2d 163 (2010). The second prong of the *Cofield* test is understood as "limited to cases that replicate the circumstances in *Cofield.*" *Williams, supra,* 190 *N.J.* at 131, 919 *A.*2d 90. Temporality and similarity of conduct is not always applicable, and thus not required in all cases. *See P.S., supra,* 202 *N.J.* at 255 n. 4, 997 *A.*2d 163. Moving on to the third prong, the prosecution must establish that the act of uncharged misconduct which it seeks to introduce into evidence actually happened by "clear and convincing" evidence. *Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230.

■ The fourth prong of the *Cofield* test is typically considered the most difficult to overcome. *Barden, supra,* 195 *N.J.* at 389, 949 *A.*2d 820. "Because of the damaging nature of such evidence, the trial court must engage in a careful and pragmatic evaluation of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." *Ibid.* (citation and internal quotation marks omitted).

That standard is more exacting than *Rule* 403, which provides that relevant evidence is admissible unless its probative value is *substantially* outweighed by the risk of undue prejudice. *Reddish, supra,* 181 *N.J.* at 608, 859 *A.*2d 1173. And, "[i]f other less prejudicial evidence may be presented to establish the same issue, the balance in the weighing process will tip in favor of exclusion." *Barden, supra,* 195 *N.J.* at 392, 949 *A.*2d 820 (citation omitted); *see P.S., supra,* 202 *N.J.* at 256, 997 *A.*2d 163. Additionally, in order to minimize "the inherent prejudice in the admission of other-crimes evidence, our courts require the trial court to sanitize the evidence when appropriate." *Barden, supra,* 195 *N.J.* at 390, 949 *A.*2d 820 (citation omitted). Finally, limiting instructions must be provided to inform the jury of the purposes for which it may, and for which it may not, consider the evidence of defendant's uncharged misconduct, both when the evidence is first presented and again as part of the final jury charge. *Ibid.* A suitable limiting instruction "explain[s] precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *Ibid.* (citation and internal quotation marks omitted).

With those principles as our guide, we turn to review the disputed evidence in defendant's trial.

## C.

Defendant reiterates the objections he raised at the *Rule* 104 hearing to challenge the introduction of any evidence during the trial relating to his incarceration on an indictment that charged him with the attempted murder of Mosley when Mosley was killed. His focus is on three pieces of evidence: (1) Puglia's testimony that defendant spoke with him about having Mosley killed while the two men were in jail; (2) Graves's testimony that defendant solicited him and provided him instructions on killing Mosley while they were incarcerated together; and (3) defendant's indictment for the attempted murder of Mosley. The trial court

did not consider *Rule* 404(b) applicable to that evidence. Instead, the court admitted the indictment through a stipulation, allowed Graves's testimony about his solicitation to be admitted as part of the res gestae of the charged crime, and declared Puglia's testimony about his conversation with defendant, in which defendant's expressed his plans for Mosley, to be evidence of this crime and not "other" crime evidence, and therefore exempt from *Rule* 404(b)'s requirements for admission. Thus, we can and will conduct our own review of the evidence's admissibility under *Rule* 404(b).[11] *See Barden, supra,* 195 *N.J.* at 391, 949 *A.*2d 820 (citation omitted). Under that analysis, one begins—as is always the case, whether under *Rules* 401 and 403 or under *Rule* 404(b)— by addressing the relevance of the evidence.

*Cofield*'s initial prong requires an examination of the "other" crime or act evidence for relevance. Here the fact that defendant was indicted for the attempted murder of Mosley was relevant to material issues in dispute at trial, namely defendant's motive for having Mosley killed, his intent that Graves kill Mosley, and the plan that he formulated with Graves on how to kill Mosley. The fact that defendant was in jail because he had attempted to kill Mosley was not introduced into evidence by the State to show that defendant was a criminal capable of killing someone and thus should be convicted on that basis. Rather, the State relied on the fact that defendant was in jail for the attempted murder of Mosley, when Mosley was killed, to highlight the fact that defendant had a motive, the requisite intent, and a plan to have Mosley killed—all proper non-propensity purposes under *Rule* 404(b).

Although the trial court did not explicitly consider all of the challenged evidence under *Rule* 404(b), the court did recognize

---

[11] At the outset we note that this case is unlike other cases involving *Rule* 404(b). In other cases, the prosecutor can charge the defendant with the acts of uncharged misconduct that the prosecutor wishes to have admitted into evidence but chooses not to, perhaps for strategic reasons. Here, because of Mosley's murder, the indictment charging defendant with attempted murder had to be dismissed because Mosley was the key witness in that case.

and state on the record that the evidence in issue was relevant to defendant's "motive and intent and plan." Indeed, as part of defendant's strategy, he argued at trial that he

had merely asked Graves to try to persuade Mosley to drop the charges against him; that Graves had intended to do nothing more, but had killed Mosley in self-defense when Mosley had attacked him with a tire iron; that any of defendant's statements to Puglia that suggested otherwise represented mere "talk," and were not credible; and that Graves had falsely implicated defendant in order to get the benefit of a favorable plea bargain.

Thus, defendant's intent that Graves actually kill Mosley and not just "try to persuade [him] to drop the charges" was a disputed material issue. Also in dispute was whether defendant had formulated a plan with Graves about how to kill Mosley, which contradicted defendant's contention that "Graves had intended to do nothing more [than persuade Mosley to drop the charges], but [then] had killed Mosley in self-defense." Likewise, although defendant did not expressly place the issue in dispute, his motive was material, and vitally so, because it was the string that tied the State's entire case together. Without knowing that defendant was in prison on charges that he attempted to murder Mosley at the time that Mosley was killed, the jury would have been left without a crucial piece of evidence: why defendant wanted Mosley killed. Thus, the first prong of the *Cofield* test plainly was satisfied in this case.

The second prong of the *Cofield* test, addressing the similarity and temporality of the evidence, is not found in *Rule* 404(b), and is not universally required. *See P.S., supra,* 202 *N.J.* at 255 n. 4, 997 *A.*2d 163 (citing *Williams, supra,* 190 *N.J.* at 131, 919 *A.*2d 90). It is inapplicable here. Turning to the next requirement, prong three of the *Cofield* analysis requires that the evidence of uncharged acts of misconduct be proven by clear and convincing evidence. *See State v. Hernandez,* 170 *N.J.* 106, 119–21, 127, 784 *A.*2d 1225 (2001). Although here there was no hearing to hold the prosecutor to that burden of proof, the surrounding circumstances adequately support that the third prong of *Cofield* was satisfied. Defendant had been indicted on the attempted murder charge and was in jail awaiting a trial that was scheduled to start in a matter

of weeks when Mosley was killed. The criminal justice system may not be infallible, but nevertheless those facts provide sufficient support for finding that the clear and convincing standard of proof was met in regard to the pending charges against defendant for previously attempting to kill Mosley. Indeed, because the key witness in respect of those charges—Mosley—was murdered, it would be perverse to allow defendant to benefit from Mosley's murder by foiling the State's use of the evidence based on this prong of the *Cofield* analysis.

Finally, the fourth prong of *Cofield* requires a balancing of the probative value of the evidence as compared to its prejudicial effect, and necessarily implicates an examination into whether less inflammatory sources of evidence that are equally probative are available. *Barden, supra,* 195 *N.J.* at 392, 949 *A.*2d 820. Evidence that defendant was incarcerated for the attempted murder of Mosley was the most prejudicial piece of evidence against him. But, it was prejudicial in the way that all highly probative evidence is prejudicial: because it tends to prove a material issue in dispute. The determinative question is whether the evidence was *unfairly* prejudicial, that is whether it created a significant likelihood that the jury would convict defendant on the basis of the uncharged misconduct because he was a bad person, and not on the basis of the actual evidence adduced against him. We conclude that the evidence admitted here was not overly prejudicial. It was carefully presented so as not to suggest to the jury that defendant had a propensity to commit bad acts and should be convicted on that basis. Rather, it was admitted for the proper purpose of explaining why defendant committed this particular crime, something that would not have been possible without admitting evidence that defendant was awaiting trial on charges that he had attempted to murder Mosley.

Thus, despite the potential prejudice of admitting evidence that defendant was incarcerated on charges that he attempted to kill Mosley, it was also the most probative piece of evidence in the case. Forcing the prosecution to ignore such a key piece of

evidence would have left the jury with more questions than answers. Without that knowledge, the jurors would have been left with a huge gap in understanding the evidence at the center of the case; they would have known that defendant wanted Mosley killed but would have had no idea why that was the case. At a very basic level the evidence was classic motive evidence. A wide range of motive evidence is generally permitted, and even where prejudicial, its admission has been allowed in recognition that it may have "extremely high probative value." *State v. Long*, 173 *N.J.* 138, 164–65, 801 *A.*2d 221 (2002); *see State v. Rogers*, 19 *N.J.* 218, 228, 116 *A.*2d 37 (1955) (discussing usefulness and wide admissibility of motive evidence). Parsed more finely, the three pieces of evidence—the indictment, Puglia's testimony, and Graves's testimony—properly went to defendant's motive, as well as to defendant's intent and plan, and the probative value of the evidence was not outweighed by its prejudice.

As for whether less prejudicial means of conveying the relevant information were available, one could argue that it was questionable whether all three pieces of evidence needed to be admitted when they were in some ways cumulative to each other. In particular, Puglia's testimony is weak in this respect because it concerned general discussions and not solicitations to kill Mosley or formulation of a concrete plan to effectuate Mosley's murder, as was the case concerning defendant's discussions with Graves. However, it did provide independent evidence that went to defendant's plan or intent to murder Mosley while he was in jail awaiting trial on the attempted murder charges where Mosley would be the chief witness against him. In these circumstances, we are not convinced that Puglia's testimony should have been excluded on this basis, particularly in view of the extensive and repetitive limiting instructions provided.

Although the trial court did not analyze all of the evidence in issue under *Rule* 404(b), it did provide appropriate jury instructions to limit the prejudice suffered by defendant as if all the evidence had been scrutinized through *Rule* 404(b)'s filter. Limit-

ing instructions were given when the jury first learned that defendant was incarcerated on charges that he had attempted to murder Mosley, after Puglia's testimony, after Graves's testimony, and again during the final jury charge. One instruction informed the jury:

> [Y]ou may not use this evidence to decide that the Defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the Defendant ... had charges pending against him, or was incarcerated in the County Jail, that he must be guilty of the present crime.
>
> Admitted—I have admitted the evidence only to help you decide the specific question of his knowledge of what happened or his motive and/or intent to have Mr. Mosley killed and/or his formulation of a plan to have him killed.
>
> You may not consider it for any other purpose and may not find the Defendant guilty simply because the State has offered evidence that he has committed other crimes, wrongs or acts.

That limiting instruction properly informed the jury about the distinction between the permitted and prohibited uses of the evidence in sufficient reference to the specific facts of this case. The trial court also instructed the jury that it could not rely on the fact that defendant was incarcerated at the time Mosley was killed as evidence that he "has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because he was in jail, he must be guilty of the present crime." That piece of evidence, the trial court cautioned the jury, was only admitted

> to provide you with the location of the discussions, to assist you in your understanding of the context and background of them. You may not consider it for any other purpose and may not find the Defendant guilty now simply because the State has offered evidence that he was incarcerated in the County Jail at any time.

And, to the extent that it could be argued that the fact that defendant was in jail at the time should have been sanitized, that fact was necessary to explain why defendant could not kill Mosley himself and solicited Graves to do it and also highlighted defendant's overarching motivation, which was to get out of jail.

In sum, our independent analysis leads to the conclusion that the evidence in issue would have been admissible under *Rule* 404(b). Although a proper and thorough *Rule* 404(b) analysis should have been conducted in respect of all of the evidence related to defendant's indictment and incarceration on charges for

the attempted murder of Mosley, we hold that defendant suffered no error, let alone reversible error, as a result of the admission of the evidence. In that respect, we affirm as modified, the judgment of the Appellate Division.

## III.

The various positions taken by counsel, the trial court, and the Appellate Division, as to how to analyze the disputed misconduct evidence, demonstrate that there exists confusion and uncertainty about the use of the common law doctrine of res gestae, and its very status as a viable feature of New Jersey's evidence jurisprudence. Its insinuation into this case's evidential issues led the analysis to stray from the preferred examination for the admission and use of misconduct evidence required by *Rule* 404(b). One must ask what value there is in condoning continued reliance on a common law doctrine whose continued use is asserted to be redundant at best and confusing at worst.

The doctrine of res gestae has been controversial, to say the least, and not just of late. Critics of the doctrine have long noted that evidential rulings explained on the basis of res gestae tend to be result-oriented and conclusory, leading to imprecise and discordant admissibility determinations. An incantation that evidence is "res gestae" is said to lack, fundamentally, the analytic rigor, precision, and uniformity that evidential rulings were intended to have under the codified *Rules of Evidence*. In order to give those arguments proper consideration, it is useful to review some background, much of which has been covered at various times in the past when res gestae's continued use was questioned.[12]

---

[12] Justice Stein called for re-examination of res gestae's use in *State v. Long*, 173 *N.J.* 138, 166–71, 801 *A.2d* 221 (2002) (Stein, J., concurring in part, dissenting in part). From time to time since, there have been separate opinions urging the Court to consider abandoning the doctrine. *See, e.g., State v. Kemp*, 195 *N.J.* 136, 157–63, 948 *A.2d* 636 (2008) (Albin, J., concurring).

## IV.

Res gestae translates from Latin as "things done," and from that translation springs its conceptualization both as an independent hearsay exception and as a shorthand reference to intrinsic evidence of a singular transaction or event. *See Black's Law Dictionary* 1423 (9th ed.2009). The term has been traced to 1637, but did not become commonly used until the 1800s. *See* 6 *Wigmore on Evidence* § 1767, at 254 & n. 1, 255 (Chadbourn rev.1976).[13] It has since evolved into a term of art that embodies the two aforementioned distinct concepts.

### A.

The first concept relates to its historical pedigree as a hearsay exception. In the nineteenth century "the theory of hearsay was not well developed, and the various exceptions to the hearsay rule were not clearly defined. In this context, the phrase *res gestae* served as a convenient vehicle for escape from the hearsay rule...." 2 *McCormick on Evidence* § 268, at 245 (Broun ed., 6th ed.2006). At that time there were no codified evidence rules, and res gestae played an important role in the development of evidence law and, in particular, to the demarcation of the modern exceptions to the hearsay rule. *See B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.*, 324 *Md.* 147, 596 *A.*2d 640, 644 (1991) ("[T]he term [res gestae] came into usage at a time when the theory of hearsay was not well developed and the various exceptions not clearly defined.").

Thus, res gestae was conceived of as an exception to the hearsay rule that allowed for the admission of statements that were made at the time that the principal act in issue occurred. 2 *McCormick on Evidence, supra*, § 268, at 245–46. Over time that

---

[13] New Jersey courts have used res gestae as an evidentiary doctrine since 1819. *See Ogden v. Gibbons*, 5 *N.J.L.* 612, 631–32 (Sup.Ct.1819) (admitting hearsay evidence as res gestae of charged trespass because evidence was necessary to establish motive); *Den v. Vancleve*, 5 *N.J.L.* 695, 758 (Sup.Ct.1819) (explaining res gestae as exception to rule against hearsay).

conception of res gestae expanded to allow for the introduction of statements that accompanied any act relevant to the case in issue. *Id.* at 246. The theories behind res gestae as a hearsay exception were twofold. The first was that a witness should be allowed "to tell his or her story in a natural way by reciting all that happened at the time of the narrated incident, including those details that give it life and color." *Ibid.* The second was that spontaneous statements, by their very nature, exhibit an enhanced degree of trustworthiness and should therefore be admissible. *Ibid.*

The first comprehensive discussion of res gestae in New Jersey reflects those purposes to the doctrine. In *Hunter v. State,* 40 *N.J.L.* 495, 534–45 (E. & A.1878), the Court of Errors and Appeals held that the admission of hearsay evidence that expressed a present sense impression was admissible as res gestae, further explaining as follows:

> The *res gestae* may therefore be defined as those circumstances which are the undesigned incidents of a particular litigated act, which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary, in this sense, that they are part of the immediate preparations for, or emanations of such act, and are not produced by the calculated policy of the actors.
>
> [*Id.* at 538–39 (quotation marks omitted).]

New Jersey courts validating the admission of evidence under the doctrine of res gestae generally looked to whether the evidence was so closely related to the matter at hand that it was indispensable to fair adjudication. As indicated by this Court's often-quoted rationale, truth was the justifying principle for the admission of res gestae evidence:

> [T]he admissibility of the proofs as *res gestae* has as its justifying principle that truth, like the Master's robe, is of one piece, without seam, woven from the top throughout, that each fact has its inseparable attributes and its kindred facts materially affecting its character, and that the reproduction of a scene with its multiple incidents, each created naturally and without artificiality and not too distant in point of time, will by very quality and texture tend to disclose the truth.
>
> [*Robertson v. Hackensack Trust Co.,* 1 *N.J.* 304, 312, 63 A.2d 515 (1949).]

Relying on the search for truth as an animating principle for expansion, res gestae embraced both hearsay statements and

other acts, which included both bad acts that are separate from the charged crime and bad acts that are components of the charged crime.[14] Focusing on the hearsay use, the doctrine became an exception to the general prohibition of hearsay evidence, rendering admissible out-of-court statements connected to an act because they were necessary in order to understand the events and had an inherent guarantee of trustworthiness. *See, e.g., Robertson, supra,* 1 *N.J.* at 312, 63 *A.*2d 515; *Hunter, supra,* 40 *N.J.L.* at 538–39. To be res gestae, the.statements had to be "so connected with an act" as to constitute a part of the act. *See Hunter, supra,* 40 *N.J.L.* at 537. Further, the statements had to be "incidental to" and "inherently [a] part of 'a particular litigated act.'" *State v. Branch,* 182 *N.J.* 338, 358, 865 *A.*2d 673 (2005) (quoting *Robertson, supra,* 1 *N.J.* at 313, 63 *A.*2d 515). "The declaration and the act must make up one transaction." *Hunter, supra,* 40 *N.J.L.* at 537. The *Hunter* Court reasoned that

> [t]he theory justifying [res gestae] is that, when such declarations are thus coupled with a provable act, they receive confirmation from it; but if they stand alone, without such support, they depend altogether for their credence on the veracity of the utterer, and thus conditioned, they are pure hearsay, and inadmissible.
> [*Ibid.*]

Despite initially requiring that a statement be strictly contemporaneous with the action, *see Hayes v. Jersey City, Hoboken & Paterson St. Ry. Co.,* 73 *N.J.L.* 639, 641–42, 64 *A.* 119 (E. & A.1906), that requirement was loosened to permit courts to evaluate whether circumstances.beyond the temporal proximity indicated the veracity of the statement. *See State v. Simmons,* 52 *N.J.* 538, 542, 247 *A.*2d 313 (1968).

As res gestae, statements were admitted that expressed the declarant's state of mind, present bodily condition, and present

---

14 Res gestae also has been cited as the explanation for admitting relevant evidence. *See, e.g., State v. Deegan,* 133 *N.J.L.* 263, 44 *A.2d* 104 (E. & A.1945) (permitting photographs of decedent and family to be admitted as res gestae); *State v. Weiner,* 101 *N.J.L.* 46, 49, 127 *A.* 582 (Sup.Ct.1925) (admitting as res gestae evidence of skid marks at accident scene); *State v. Hill,* 65 *N.J.L.* 626, 632, 47 *A.* 814 (E. & A.1900) (holding that coat's presence in room at time of murder would be admissible as res gestae).

sense impression, as well as statements characterized as excited utterances. *See, e.g., Rainess v. Grant Finishing Co.,* 133 *N.J.L.* 611, 611, 45 *A.*2d 678 (E. & A.1946) (admitting statement of intent as res gestae); *State v. Doro,* 103 *N.J.L.* 88, 94, 134 *A.* 611 (E. & A.1926) (admitting excited utterance as res gestae); *Schlemmer v. State,* 51 *N.J.L.* 23, 29, 15 *A.* 836 (Sup.Ct.1888) (admitting statement expressing declarant's state of mind as res gestae); *Donnelly v. State,* 26 *N.J.L.* 601, 612 (E. & A.1857) (admitting as res gestae statement regarding cause of injury made immediately after injury). Those uses of res gestae as a hearsay exception are now recognized as the predecessors to the codified hearsay exceptions in the *Rules of Evidence. See State v. Schumann,* 111 *N.J.* 470, 479, 545 *A.*2d 168 (1988) ("[T]he 'res gestae' exception may be viewed as a shorthand reference to the principles contained in ... [the] exceptions to the *Rule* excluding hearsay evidence[.]"). Hearsay statements once admitted under the generic term res gestae are recognized as being addressed through specific, codified exceptions to the hearsay rule, namely: (1) present sense impressions, *see N.J.R.E.* 803(c)(1); excited utterances, *see N.J.R.E.* 803(c)(2); and statements of then-existing mental, emotional, or physical conditions, *see N.J.R.E.* 803(c)(3). *See* 2 *McCormick on Evidence, supra,* § 268, at 245–46; *see also Branch, supra,* 182 *N.J.* at 357–58, 865 *A.*2d 673 ("Long before the excited utterance took on a separate identity under our modern rules of evidence, it was grouped along with several hearsay rule exceptions (verbal act, present sense impression, and statement of then existing mental, emotional, or physical condition) under the umbrella of *res gestae.*").

B.

The second concept historically embodied in the term res gestae is its use as an independent evidentiary doctrine to admit evidence of other acts. Under the common law, evidence of a defendant's uncharged criminal conduct was not admissible to show criminal propensity. *State v. Hendrick,* 70 *N.J.L.* 41, 45–46,

56 *A.* 247 (Sup.Ct.1903). However, res gestae was an exception that was used to admit evidence of other bad acts offered for a non-propensity purpose. *Id.* at 46, 56 *A.* 247. Evidence of this nature admissible as res gestae can be divided into two categories: (1) bad acts that are intrinsic to the charged crime and (2) separate crimes.

In New Jersey, res gestae has been used to admit evidence of other acts if the other act "constitute[s] part[ ] of the transaction ... without the knowledge of which the main facts might not properly be understood." *Riley v. Weigand,* 18 *N.J.Super.* 66, 73, 86 *A.*2d 698 (App.Div.1952). Second, res gestae has been invoked to admit evidence of separate crimes if the evidence was not offered to show propensity. *State v. Sinnott,* 24 *N.J.* 408, 413–14, 132 *A.*2d 298 (1957); *see, e.g., State v. Overton,* 85 *N.J.L.* 287, 291, 88 *A.* 689 (E. & A.1913) (admitting separate crime evidence under res gestae to show motive). Prior to the promulgation of the *Rules of Evidence,* res gestae allowed the admission of evidence of separate acts to prove motive or intent. *See, e.g., Sinnott, supra,* 24 *N.J.* at 413–14, 132 *A.*2d 298; *Overton, supra,* 85 *N.J.L.* at 291, 88 *A.* 689. When codified, the *Rules of Evidence* incorporated those common law applications of res gestae in the rule specifically addressing bad acts evidence. *Rule* 404(b) admits evidence of other crimes or bad acts for non-propensity purposes. The examples of non-propensity purposes listed in *Rule* 404(b) are drawn from res gestae jurisprudence, and incorporate the holdings of cases such as *Sinnott, supra,* 24 *N.J.* at 413–14, 132 *A.*2d 298, and *Overton, supra,* 85 *N.J.L.* at 291, 88 *A.* 689.

## C.

A host of courts and commentators have criticized res gestae as being outdated and unhelpful.[15] John Henry Wigmore's evidence treatise provides a representative statement:

---

[15] *See Long, supra,* 173 *N.J.* at 166, 801 *A.*2d 221 (Poritz, C.J., concurring) (noting that res gestae, "standing alone, has been discredited by scholars as a basis to admit otherwise inadmissible evidence").

The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology. No rule of evidence can be created or applied by the mere muttering of a shibboleth.

[6 *Wigmore on Evidence, supra,* § 1767, at 255.]

And, such criticism is by no means a recent phenomenon:

The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as *"res gestae."* It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking.

[Edmund M. Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 *Yale L.J.* 229, 229 (1922).]

As one of the earliest critics of res gestae noted, "judges, text-writers, and students have found themselves sadly embarrassed by the growing and intolerable vagueness of the expression." 6 *Wigmore on Evidence, supra,* § 1767, at 255 (quoting James B. Thayer, *Bedingfield's Case—Declarations as a Part of the Res Gestae,* 15 *Am. L.Rev.* 1, 5–10 (1881)).

Because specific hearsay exceptions that would have previously fallen under the umbrella of res gestae have been codified, many courts have concluded that res gestae no longer serves a useful purpose as a free-standing exception to the hearsay rule. *See, e.g., Horton v. State,* 764 P.2d 674, 677 (Wyo.1988) (stating that because res gestae hearsay exceptions had been codified in *W.R.E.* 803, res gestae should be eliminated); *Miller v. Keating,* 754 F.2d 507, 509 n. 1 (3d Cir.1985) ("Before adoption of the Federal Rules of Evidence, courts applied *'res gestae'* with much confusion to hearsay statements of various sorts."); *see also infra* note 17. That view has been strongly encouraged by accepted mavens of evidence law development: "[t]here are words enough to describe the rules of evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an

empty phrase [res gestae] so encouraging to looseness of thinking and uncertainty of decision." 6 *Wigmore on Evidence, supra*, § 1767, at 255; *see also* 2 *McCormick on Evidence, supra*, § 268, at 246 ("The ancient phrase [res gestae] ... played a role in the evolution of evidence law and the expansion of the admission of contemporaneously made hearsay statements. [But now, largely it] appears to be a historical relic to be jettisoned from modern hearsay analysis....").

With respect to its hearsay use, res gestae appears unnecessary as an independent doctrine for the admission of hearsay evidence. Certainly our prior case law has suggested that the codified rules were drafted to reflect the permitted uses of common law res gestae evidence. *See, e.g., Branch, supra*, 182 *N.J.* at 357–62, 865 *A.2d* 673 (discussing evolution of res gestae into codified hearsay exceptions); *Schumann, supra*, 111 *N.J.* at 479, 545 *A.2d* 168 (noting incorporation of res gestae into evidence rules); *Cestero v. Ferrara*, 57 *N.J.* 497, 503, 273 *A.2d* 761 (1971) (stating that "[o]ur Rules of Evidence have undertaken to codify this broader *res gestae* principle").

Moreover, the notion that res gestae is no longer a viable independent hearsay exception is consistent with the comments of the Supreme Court Committee charged with modification of the *Rules of Evidence* in 1991 and the Court's holdings regarding the comprehensiveness of the *Rules of Evidence* on hearsay and its exceptions. Simply put, the hearsay exceptions provide a comprehensive and cohesive scheme for the permissible introduction of hearsay in our courts. When adopting our codified *Rules of Evidence*, New Jersey specifically declined to adopt a residual hearsay exception, as was adopted in the rules governing practice in the federal courts. *See Fed.R.Evid.* 807 (previously *Fed. R.Evid.* 803(24)); [16] Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence*, 1991 Supreme Court Committee Comment on

---

[16] *Fed.R.Evid.* 807 provides a residual hearsay exception for statements with "equivalent circumstantial guarantees of trustworthiness."

*N.J.R.E.* 803(c)(24) [Not Adopted] (2011). In affirmance of that rejection of any residual hearsay exception, hearsay statements that do not conform to the exceptions specifically enumerated in the *Rules of Evidence* are not admissible. *See State v. Brown*, 170 *N.J.* 138, 152–53, 784 *A.*2d 1244 (2001).

There appears to be no logical reason to treat res gestae hearsay evidence differently except out of some misguided fear that "something" might be excluded. Yet, even in the debate over the hearsay statements in *Long, supra*, the evidence was entirely tethered to hearsay exceptions that permitted its admission. 173 *N.J.* at 153–54, 801 *A.*2d 221. In sum, continued use of the moniker of res gestae adds nothing more than an interpretative descriptor that risks clouding an evidence-rule analysis or, worse, avoiding its required rigor through invocation of a result-infused term. The evidence rules that govern exceptions to the hearsay rule comprise a fully integrated doctrine and should be given the fulsome and comprehensive effect that they were intended to have. Moreover, our own case law reflects that the codified *Rules* incorporated the previous common law exceptions loosely categorized as res gestae hearsay. It is high time that the consistency that was required in *Brown*, in respect of requiring the admission of hearsay evidence only through codified hearsay exceptions, be applied to hearsay evidence of all forms, including that which has heretofore been described as res gestae.[17]

---

[17] Sister courts overwhelmingly have agreed, expressing no hesitation when finding that res gestae is no longer a valid exception to the hearsay rule. *See, e.g., Stephens v. Miller*, 13 *F.*3d 998, 1003 (7th Cir.1994) (en banc) ("[T]he use of the term *res gestae*, for purposes of federal law, is essentially obsolete."); *Keating, supra*, 754 *F.*2d at 509 (same proposition); *State v. Dennis*, 181 *Ill.*2d 87, 229 *Ill.Dec.* 552, 692 *N.E.*2d 325, 331 (1998) ("As a basis for the admissibility of hearsay evidence, Illinois has abandoned the concept of *res gestae* as amorphous, having been applied indiscriminately and inhibiting any reasonable analysis."); *State v. Gunby*, 282 *Kan.* 39, 144 *P.*3d 647, 663 (2006) ("The concept of *res gestae* is dead as an independent basis for admissibility of evidence in Kansas."); *State v. Hafford*, 410 *A.*2d 219, 220–21 (Me.1980) (expressing "disapproval of the use of the term *res gestae* " and noting that the drafters of the Rules of Evidence avoided the term "in order to expunge that phrase from [ ] Maine

The more confounding use of res gestae arises in its complication and derailing of the analysis of misconduct evidence called for under *Rule* 404(b), a problem this case so well demonstrates in respect of the treatment of Graves's and Puglia's testimony.

## V.

### A.

As noted, the common law's res gestae notion of "things done" or "inseparable crimes," developed into the enlarged doctrine through which was admitted evidence of uncharged misconduct when it was impossible to prove the crime charged without revealing the uncharged misconduct, and also when the uncharged misconduct evidence explained the circumstances surrounding the charged crime. *See, e.g., State v. Martini,* 131 *N.J.* 176, 240–42, 619 *A.*2d 1208 (1993) (holding that *Rule* 404(b)'s predecessor, *Rule* 55, did not apply to uncharged acts that, as res gestae, are components of offense for which defendant is being tried); *Riley, supra,* 18 *N.J.Super.* at 73, 86 *A.*2d 698 (stating that res gestae allows admission of evidence of other acts if other act is part of transaction "without the knowledge of which the main facts might not properly be understood"). Although the vast majority of the criticism heaped on res gestae has been directed at its existence as an exception to the rule against hearsay, scholars and commentators have explicitly called for the complete abolition of the term,

---

law of evidence"); *Bynote v. Nat'l Super Mkts., Inc.,* 891 *S.W.*2d 117, 121 (Mo.1995) (en banc) ("[W]e will no longer recognize the phrase *'res gestae'* as carrying sufficient meaning to support either the admission of or an objection to proffered testimony."); *State v. Hansen,* 296 *Mont.* 282, 989 *P.*2d 338, 354 (1999) ("The better practice is to abandon the use of the phrase [res gestae] altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented."); *State v. Flores,* 147 *N.M.* 542, 226 *P.*3d 641, 652–53 (2010) (noting that res gestae "create[s] more problems than it resolves," and "is a completely unnecessary term in the evidence context"); *Horton, supra,* 764 *P.*2d at 677 (calling for elimination of res gestae as rationale for admitting hearsay statements).

while retaining the concept of "intrinsic evidence" that it embodies for use in connection with analyses under *Rule* 404(b).

> The term "res gestae" should be once and for all abandoned as useless and confusing. Let it be said that such acts are receivable as "necessary parts of the proof of an entire deed," or as "inseparable elements of the deed," or as "concomitant parts of the criminal act," or anything else that carries its own reasoning and definition with it; but let legal discussion sedulously avoid this much-abused and wholly unmanageable Latin phrase.
>
> [1A *Wigmore on Evidence* § 218, at 1888 (Tillers rev.1983).]

How to identify what is and is not intrinsic evidence has become its own debate.

Specifically, in New Jersey, the notion of "intrinsic evidence" lies in the cross hairs of the intersection of *Evidence Rules* 401, 402, and 403, on the one hand, and *Rule* 404(b), on the other. Under *Rules* 401 and 402, relevant evidence is admissible; however, *Rule* 403 provides that "relevant evidence [admissible under *Rule* 402] may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." A different approach pertains under *Rule* 404(b), which provides that

> evidence of *other* crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [*N.J.R.E.* 404(b) (emphasis added).]

However, evidence that is intrinsic to the charged crime is exempt from the strictures of *Rule* 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under *Rule* 404(b) because it is not "evidence of *other* crimes, wrongs, or acts." *See* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239, at 445 (1978) ("One of the key words in determining the scope of *Rule* 404(b) is 'other'; only crimes, wrongs, or acts 'other' than those at issue under the pleadings are made inadmissible under the general rule.").

Thus, evidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly

the *Rule* 403 balancing test. Thus, characterization of evidence as "intrinsic" significantly affects the calculus because the principle animating *Rule* 403 is that relevant evidence is admissible unless its probative value is substantially outweighed by a negative feature of the evidence, whereas *Rule* 404(b) operates from the premise that evidence of other bad acts is inadmissible unless proffered for a proper purpose. It is therefore more likely that evidence of uncharged misconduct will be admitted into evidence if it is considered intrinsic to the charged crime and subject only to *Rule* 403 than if it is not considered intrinsic evidence and subject to both *Rule* 404(b) and *Rule* 403.

The difficulty lies in determining what evidence is intrinsic. Like its ancestor, the common law doctrine of res gestae, there also has been criticism leveled at the concept of intrinsic evidence. *See* Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, *Federal Rules of Evidence Manual* § 404.02 (9th ed.2010). Some courts have done away with it, preferring to analyze the admissibility of all uncharged misconduct solely under *Rule* 404(b). *See, e.g., United States v. Bowie*, 232 *F*.3d 923, 926–29 (D.C.Cir.2000); *State v. Fetelee*, 117 *Hawai'i* 53, 175 *P*.3d 709, 737 (2008). Alternatively, a replacement test of "inextricably intertwined evidence"[18] has developed for use in connection with 404(b) analyses, although it suffers from criticism similar to that applied to the test for intrinsic evidence:

> The inherent difficulty in the application of *Rule* 404(b) is that some conduct of the defendant that is not explicitly referred to in the charging document may nonetheless stand in such a relation to the crime charged that it cannot be considered wholly independent. Courts have referred to this uncharged criminal activity as "inextricably intertwined" with the crime charged because it is not totally separate from the crime charged. The range of evidence that is inextricably intertwined with the crime charged is as varied as the fact patterns of specific cases. [Jennifer Y. Schuster, *Special Topics in the Law of Evidence: Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence*, 42 *U. Miami L.Rev.* 947, 950 (1988) (citations omitted).]

---

18 *See* Edward J. Imwinkelried, *The Second Coming of Res Gestae: A Procedural Approach to Untangling the "Inextricably Intertwined" Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 59 *Cath. U.L.Rev.* 719 (2010).

Courts thus have different formulations for determining whether evidence is intrinsic to the charged crime, some referring to it as "inextricably intertwined" evidence, others as "intricately related," and others as "intimately related." *See Bowie, supra,* 232 *F.*3d at 928 n. 1 (explaining different formulations). There appears to be no single definitive test for determining whether evidence is intrinsic to the charged crime or even how broad that category of evidence should be; instead courts have applied a case-by-case approach. *See* Schuster, *supra,* 42 *U. Miami L.Rev.* at 951 ("Courts have not defined the scope of inextricably intertwined evidence, however, and no guidelines for determining the limits of this class of evidence exist.").[19]

## B.

In readdressing the other bad acts categories of res gestae evidence, we use this opportunity to direct trial courts to make the *Rules of Evidence* the touchstone for the analysis of all such evidence. Whenever the admissibility of uncharged bad act evidence is implicated, a *Rule* 404(b) analysis must be undertaken. The threshold determination under *Rule* 404(b) is whether the evidence relates to "other crimes," and thus is subject to continued analysis under *Rule* 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly *Rule* 403.

Although *Rule* 404(b) is often described as one of exclusion, it focuses on a distinct, worrisome category of evidence that, if

---

[19] A recent iteration of the inextricably intertwined test appears in *State v. Nelson,* in which the Supreme Court of Iowa reaffirmed the doctrine as a "narrow exception to the general rule against admitting evidence of other crimes" and held that its use may only be allowed "to complete the story of what happened when the other crimes, wrongs, or acts evidence is so closely related in time and place and so intimately connected to the crime charged that it forms a continuous transaction." 791 *N.W.*2d 414, 423 (Iowa 2010). Such evidence may be used to complete the story only "when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading." *Ibid.*

presented, is only admissible for limited purposes, and the jury must be informed both as to how the evidence may, and may not, be used. The *Rule* provides an analytical framework through which all potential "other crimes, wrongs, or acts" evidence should be sifted. Hence *Rule* 404(b) shall be the default starting point for analysis of uncharged bad acts that in the past had been also known as res gestae.

To aid courts and litigants in making the threshold determination of whether the evidence relates to "other crimes" or is intrinsic to the charged crime, we look to the Third Circuit's statement of the test in *United States v. Green,* 617 *F.*3d 233 (3d Cir.2010). *Green* provides a workable, narrow description of what makes uncharged acts intrinsic evidence of the charged crime, and therefore not subject to *Rule* 404(b)'s directed purpose requirements. As the Court of Appeals explained,

we ... reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it "directly proves" the charged offense. This gives effect to *Rule* 404(b)'s applicability only to evidence of *"other* crimes, wrongs, or acts." If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." But all else must be analyzed under *Rule* 404(b).

As a practical matter, it is unlikely that our holding will exclude much, if any, evidence that is currently admissible as background or "completes the story" evidence under the inextricably intertwined test. We reiterate that the purpose of *Rule* 404(b) is "simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence." *"No other use* of prior crimes or other bad acts if forbidden by the rule," and one proper use of such evidence "is the need to avoid confusing the jury."

[*Id.* at 248–49 (emphasis in original) (internal citations omitted) ].

The *Green* court's prediction about the impact of its tight delineation of intrinsic evidence is plainly tied to its expectation that a "no confusion" use of *Rule* 404(b) other-crime evidence will provide a better channeled use of such evidence before the jury. *Green* explains that principle through its citation to two cases as examples, *United States v. Taylor,* 522 *F.*3d 731 (7th Cir.2008), and *United States v. Simmons,* 679 *F.*2d 1042 (3d Cir.1982), noting that *Simmons, supra,* 679 *F.*2d at 1050, has long recognized "that

other crimes evidence may be admissible if offered for *any* non-propensity purpose, [including] the need 'to provide necessary background information' about the relationships among the players as a proper purpose." *Green, supra,* 617 *F.*3d at 249. Thus, the *Green* court added, in a concluding emphasis, that

> most, if not all, other crimes evidence currently admitted outside the framework of *Rule* 404(b) as "background" evidence will remain admissible under the approach we adopt today. The only difference is that the proponent will have to provide notice of his intention to use the evidence, and identify the specific, non-propensity purpose for which he seeks to introduce it (*i.e.,* allowing the jury to hear the full story of the crime).
>
> [*Ibid.*]

*See also id.* at 249 n. 15 (adding that even when admissible as having clarifying "background" value, *Fed.R.Evid.* 403 balancing is required).

*Green's* tight description of intrinsic evidence narrows the field of uncharged misconduct that is excluded from 404(b)'s channeled analysis. The addition of a notice requirement for all 404(b) evidence, which has not been required to date, *see State v. Nance,* 148 *N.J.* 376, 386–87, 689 *A.*2d 1351 (1997) (omitting notice from listed obligations for *Rule's* operation), but which we now endorse and will require prospectively, will encourage an orderly discussion and analysis of such evidence that will require parties and trial courts to engage in the rigorous and thoughtful analysis of the proper use of such testimony, and thus deter off-the-cuff conclusory explanations to which res gestae claims, and rulings, are prone.

There is no need to regard our *Evidence Rule* 404(b) as containing an exhaustive list of the non-propensity purposes permitted of other crime evidence. Just as was recognized in *Green,* there is no reason that our courts cannot allow, under our *Rule* 404(b), evidence to be admitted for a similar "necessary background" or, as otherwise stated, "the need to avoid confusing the jury," non-propensity purpose. *See Green, supra,* 617 *F.*3d at 249. As the Third Circuit has recognized for the comparable *Federal Rule of Evidence,* and as Judge Posner persuasively discussed in

*Taylor, supra,* 522 *F.*3d at 734–36, we need not apply the listed exceptions in 404(b) as if they were exhaustive.

In sum, New Jersey's *Evidence Rules* provide the structure by which evidential rulings should be analyzed and explained by trial courts, informed by the paradigm set forth herein. With this opinion, we disapprove of the further use of res gestae to support evidential rulings. Fundamentally, invocations of res gestae as the basis for the admission of evidence do lack the analytic rigor, precision, and uniformity that evidential rulings were intended to have under the codified *Evidence Rules.*[20] Therefore, with this appeal, we end the practice of invoking "res gestae" as an explanation for the admission of evidence, in circumvention of the application of the formal *Rules of Evidence.* We do this as an aid for courts and for litigants because it will promote uniformity and predictability in the consideration of evidence. We hold that the *New Jersey Rules of Evidence* must govern the analysis, and support the admission of evidence that heretofore has been referred to as res gestae.

## VI.

As a final matter, we add the following. According to our dissenting colleagues, any part of a judicial decision by this

---

[20] Although some common law evidentiary exceptions were stated to have survived the adoption of the *New Jersey Rules of Evidence,* our decisions have recognized that the benefit from having codified rules was the capacity to "place both the bench and the bar on notice of the fundamental framework for the admission of evidence during a trial." *See, e.g., State v. Byrd,* 198 *N.J.* 319, 345, 967 A.2d 285 (2009) (citing Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 102 (2008) ("New Jersey's *Rules of Evidence* provide a comprehensive and coherent structure designed to provide specific instruction to the bench and bar in the vast array of evidentiary contexts that may arise in contested trials.")). Where a common law evidential principle impedes the uniform and predictable application of the codified rules, it can and should be abandoned, thereby eliminating an obstacle to clarity promised by the adoption of a cohesive set of rules for the admissibility of evidence. Accordingly, with respect to continued reference to "res gestae" as a basis for the admission of evidence, that finishing point has arrived.

Court that goes beyond the minimum needed to accord relief to the parties to an action constitutes non-precedential dicta. That proposition is contrary to the established principle articulated in various respected authorities that

> an expression of opinion on a point involved in a case, argued by counsel and deliberately mentioned by the court, although not essential to the disposition of the case ... becomes authoritative[ ] when it is expressly declared by the court as a guide for future conduct.
>
> [21 *C.J.S. Courts* § 230 (2006).]

Phrased differently, "matters in the opinion of a higher court which are not decisive of the primary issue presented but which are germane to that issue ... are not dicta, but binding decisions of the court." 5 *Am. Jur.2d Appellate Review* § 564 (2007).

As explained in the context of the federal system by the First Circuit:

> [A]ppellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement. If lower courts felt free to limit Supreme Court opinions precisely to the facts of each case, then our system of jurisprudence would be in shambles, with litigants, lawyers, and legislatures left to grope aimlessly for some semblance of reliable guidance.
>
> [*McCoy v. Mass. Inst. of Tech.,* 950 *F.*2d 13, 19 (1st Cir.1991) (internal citations omitted), *cert. denied,* 504 *U.S.* 910, 112 *S.Ct.* 1939, 118 *L.Ed.*2d 545 (1992).]

Judge Easterbrook, writing for the Seventh Circuit, further illustrated the absurdity of a contrary approach:

> As with *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), *Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.*2d 935 (1974), and other comprehensive decisions, almost all of the opinion could be labeled dicta. The details of *Miranda,* for example, could be disregarded on the ground that Ernesto Miranda had not been given any warning, so the Court could not pronounce on the consequences of giving three but not four of the warnings on its list. The Court has rebuffed arguments of this sort, however.
>
> [*Faheem–El v. Klincar,* 841 *F.*2d 712, 730 (7th Cir.1988).]

 In sum, the legal findings and determinations of a high court's considered analysis must be accorded conclusive weight by lower courts.[21] Our courts have consistently followed this rule.

---

[21] *Accord United States v. Underwood,* 717 *F.*2d 482, 486 (9th Cir.1983) ("In the decision of individual cases the Court must and regularly does establish

*See, e.g., State v. Breitweiser,* 373 *N.J.Super.* 271, 282–83, 861 *A.*2d 176 (App.Div.2004), *certif. denied,* 182 *N.J.* 628, 868 *A.*2d 1031 (2005).

And when confronting the precise issue of this appeal—the viability of res gestae—our sister courts have similarly abolished that doctrine in cases where the contested evidence was deemed admissible through the formal rules of evidence, and thus, where the decision to eliminate res gestae did not affect the cases' outcome. *State v. Gunby,* 282 *Kan.* 39, 144 *P.*3d 647, 660–61 (2006); *Bynote v. Nat'l Super Mkts., Inc.,* 891 *S.W.*2d 117, 121 (Mo.1995) (en banc). The abolition of res gestae by those courts is hardly, as the dissent would appear to believe, mere dicta that need not be followed.

## VII.

The judgment of the Appellate Division is affirmed as modified by this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent the majority concludes that the admission of the challenged evidence was proper under *N.J.R.E.* 404(b), and there-

---

guidelines to govern a variety of situations related to that presented in the immediate case. The system could not function if lower courts were free to disregard such guidelines whenever they did not precisely match the facts of the case in which the guidelines were announced."), *cert. denied,* 465 *U.S.* 1036, 104 *S.Ct.* 1309, 79 *L.Ed.*2d 707 (1984); *Pub. Serv. Co. v. GE Co.,* 315 *F.*2d 306, 310 n. 6 (10th Cir.) ("Without exploring the intricate distinctions between dictum and language necessary to decision, we conclude that we must recognize the clear, direct, explicit, and unqualified statement of the Supreme Court."), *cert. denied,* 374 *U.S.* 809, 83 *S.Ct.* 1695, 10 *L.Ed.*2d 1033 (1963); *People v. Williams,* 204 *Ill.*2d 191, 273 *Ill.Dec.* 250, 788 *N.E.*2d 1126, 1136 (2003) ("[C]omments in a judicial opinion that are unnecessary to the disposition of the case, but involve an issue briefed and argued by the parties ... have the force of a determination by a reviewing court and should receive dispositive weight in an inferior court."); *Luhman v. Beecher,* 144 *Wis.*2d 781, 424 *N.W.*2d 753, 755 (App.1988) ("[M]atters not decisive to the primary issue presented but germane to that issue are not dicta, but binding decisions of the court.").

fore affirms defendant's conviction, I concur. However, to the extent the majority takes the added, unnecessary step of jettisoning the doctrine of res gestae from our jurisprudence, I dissent on two separate grounds: the majority's discussion is plain dicta, deserving of no jurisprudential value; and the majority's reasoning and conclusions are ill-conceived and simply in error.

## I.

As the majority well recognizes, this appeal was fully and completely decided once it concluded that "the evidence in issue would have been admissible under *Rule* 404(b)[,]" that "defendant suffered no error, let alone reversible error, as a result of the admission of the evidence[,]" and that, as a result, "we affirm as modified, the judgment of the Appellate Division." *Ante* at 167, 19 *A*.3d at 1001. Nevertheless, the majority creates a straw man and then proceeds to knock it down when it asserts that "[t]he various positions taken by counsel, the trial court, and the Appellate Division ... demonstrate that there exists confusion and uncertainty about the use of the common law doctrine of res gestae, and its very status as a viable feature of New Jersey's evidence jurisprudence." *Ibid.*

That justification for addressing and ultimately discarding, in the context of this appeal, the continued viability of the doctrine of res gestae lays bare the true nature of the majority's pronouncements on the issue: they are nothing more than "dicta, 'that is, something that is unnecessary to the decision in the case and therefore not precedential[.]'" *State v. McLaughlin,* 205 *N.J.* 185, 200 n. 10 (2011) (quoting *Dean v. Barrett Homes, Inc.,* 204 *N.J.* 286, 307, 8 *A*.3d 766 (2010) (Rivera–Soto, J., concurring in part and dissenting in part) (citations and internal quotation marks omitted)). For that reason, the majority's declaration to "end the practice of invoking 'res gestae' as an explanation for the admission of evidence, in circumvention of the application of the formal *Rules of Evidence* [,]" *ante* at 182, 19 *A*.3d at 1011, is categorically and without doubt unnecessary to the outcome of this appeal. It

is blunt force dicta—plain and simple—and, as such, it should be disregarded in its entirety.

## II.

Furthermore, the majority incorrectly conflates—and thereby improperly confuses—two separate and distinct concepts well grounded in evidence law: the admissibility of other bad act evidence under *N.J.R.E.* 404(b), and the admission of evidence of res gestae. In the established law of evidence, those notions represent, instead, independent principles, each of which is worthy of its own, stand-alone dignity.

By its explicit terms, *Evidence Rule* 404 proscribes the admission of "[e]vidence of a person's character or character trait, including a trait of care or skill or lack thereof, ... for the purpose of proving that the person acted in conformity therewith on a particular occasion[.]" *N.J.R.E.* 404(a). As this Court made clear in *Johnson v. Dobrosky,*

> evidence of a person's character or a trait thereof is not admissible when it is not an element of a claim or defense. Admissibility thus depends upon the connection between proffered character evidence and a claim or defense that is actually in issue. That limitation reflects the danger inherent in the introduction of such evidence—its susceptibility to convert a trial of the issue to a judgment of the person. Thus, for character evidence to be admissible ... a person's character or a trait of his character must be related to a specific claim or defense in the case. [187 *N.J.* 594, 604, 902 *A.*2d 238 (2006) (citations and internal quotation marks omitted).]

More to the point, although *N.J.R.E.* 404(b) repeats the general proposition that "[e]xcept as otherwise provided ... evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith[,]" that *Rule* additionally provides that "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."

Res gestae, in contrast, focuses on a fundamentally different concern. As commentators on our *Rules of Evidence* aptly have

noted, "[c]onduct *which is the subject matter of the action being tried* cannot be excluded under *N.J.R.E.* 404(b) because the rule is only a consideration with respect to *conduct that occurred on other occasions.*" Biunno, Weisbard & Zegas, *New Jersey Rules of Evidence,* Comment 7 to *N.J.R.E.* 404, at 194 (2011) (emphasis supplied). In straightforward terms, then, res gestae "literally means 'things done,' and under the *res gestae* doctrine a contemporaneous statement involving events surrounding a disputed issue [i]s admissible." *State v. Branch,* 182 *N.J.* 338, 358, 865 *A.2d* 673 (2005) (citation and internal quotation marks omitted). That principle long has been an integral part of New Jersey's evidence jurisprudence, and most clearly so since one of the earliest cases decided by this Court once its composition was altered under the 1947 Constitution. Thus, in *Robertson v. Hackensack Trust Co.,* this Court proclaimed clearly that

> the admissibility of the proofs as *res gestae* has as its justifying principle that truth, like the Master's robe, is of one piece, without seam, woven from the top throughout, that each fact has its inseparable attributes and its kindred facts materially affecting its character, and that the reproduction of a scene with its multiple incidents, each created naturally and without artificiality and not too distant in point of time, will by very quality and texture tend to disclose the truth. [1 *N.J.* 304, 312, 63 *A.2d* 515 (1949).]

Until today, this Court has recognized and honored that difference, and unfailingly has drawn a distinction between res gestae and the proscription against prior bad acts codified in *N.J.R.E.* 404(b). In so doing, it has emphasized that

> "[t]he rule ... is that where the declaration is concomitant with the main fact under consideration and is so connected with it as to illustrate its character, it may be proved as part of the res gestae; but, where it is merely narrative of a past occurrence, it cannot be received as proof of the character of that occurrence." [*State v. Long,* 173 *N.J.* 138, 155, 801 *A.2d* 221 (2002) (quoting *Blackman v. W. Jersey & Seashore R.R. Co.,* 68 *N.J.L.* 1, 2, 52 *A.* 370 (Sup.Ct.1902)).]

The clear salutary effects generated by the prohibition against proof of prior bad acts, on the one hand, and the res gestae doctrine, on the other, more than amply counsel that this Court should continue to consider them separately for a bedrock reason: while res gestae focuses on the statement, act or omission to speak or act as an integral part of the matter directly at issue, *N.J.R.E.*

404(b) addresses an offer of proof of statements or acts occurring separate and apart from the matter at issue but offered to prove a fact relevant to the matter at issue, something far different than proof of the matter itself. Therefore, to "disapprove of the further use of res gestae to support evidential rulings [purportedly because] invocations of res gestae as the basis for the admission of evidence . . . lack the analytic rigor, precision, and uniformity that evidential rulings were intended to have under the codified *Evidence Rules* [,]" *ante* at 182, 19 *A.*3d at 1011, as the majority gratuitously has done here, is plainly incorrect and ignores the different focuses and purposes of the two evidentiary rules.

Moreover, in light of the foregoing, it is ironic that, while explicitly discarding the well recognized res gestae doctrine, the majority implicitly preserves its substance by embracing the admissibility of evidence that is "intrinsic to the crime charged." *Ante* at 179–82, 19 *A.*3d at 1009–11. By so doing, the majority runs afoul of the Shakespearean injunction: "What's in a name? That which we call a rose by any other name would smell as sweet." William Shakespeare, *Romeo and Juliet*, act 2, sc. II. In short, evidence "intrinsic to the crime charged" is res gestae evidence, no matter what moniker it is given.

Because I cannot join in the wholesale and needless abandonment of a time-honored doctrine for what are less-than-convincing reasons, I dissent.

### III.

I add only the following. Relying on secondary, nonprecedential sources, *ante* at 182–84, 19 *A.*3d at 1011–12,[1] the majority

---

[1] To the extent the majority cites to any decisional authority, it is to that of lower courts rationalizing why they must abide by the dicta issued by their respective courts of last resort. None of those cases addressed the question presented here: whether it is jurisprudentially sound for a court—particularly a court of last resort—to decide a case on narrow grounds and then volunteer a sweeping holding not necessary to the outcome. Although most often discussed and applied in respect of constitutional questions, *see, e.g., Committee to Recall*

seeks to dismiss the concerns raised here by engaging in little more than circular reasoning. According to the majority, what it says in respect of unceremoniously burying the doctrine of res gestae is not dicta for a simple, overbearing reason: because it says so.

The notion that a court of appeals willy-nilly can decide issues unnecessary to the outcome of the case results in the wholesale issuance of advisory opinions, a practice our judicial decision-making system categorically rejects. *See Abbott v. Burke*, 196 *N.J.* 544, 551, 960 *A.2d* 360 (2008) ("We cannot give an advisory opinion[.]"). It is a cornerstone of our decisional authority that "[w]e cannot answer abstract questions or give advisory opinions." *G.H. v. Twp. of Galloway*, 199 *N.J.* 135, 136, 971 *A.2d* 401 (2009) (citing *Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y.*, 58 *N.J.* 98, 107, 275 *A.2d* 433 (1971); *N.J. Tpk. Auth. v. Parsons*, 3 *N.J.* 235, 240, 69 *A.2d* 875 (1949)).[2] This Court, in *G.H.*, stated the rationale undergirding the governing rule clearly: "The judicial

---

*Robert Menendez from the Office of United States Senator v. Wells*, 204 *N.J.* 79, 141–42, 7 *A.3d* 720 (2010) (Hoens, J., dissenting) (stating that "our jurisprudence is replete with instances where we have insisted that we do not address constitutional issues when a narrower, non-constitutional result is available" (citations and internal quotation marks omitted; citing cases)); *State v. Reid*, 194 *N.J.* 386, 945 *A.2d* 26 (2008) (quoting *Bell v. Twp. of Stafford*, 110 *N.J.* 384, 389, 541 *A.2d* 692 (1988), for proposition that "court should not reach constitutional issues unless absolutely imperative to dispose of the litigation"), it is an equally appropriate observation here. And, to the extent a discrete minority of "sister courts" have chosen to jump off this particular cliff, this Court should far more humbly choose not to join them.

[2] *See also State v. Harvey*, 176 *N.J.* 522, 528, 826 *A.2d* 597 (2003) (quoting *State v. Gartland*, 149 *N.J.* 456, 464, 694 *A.2d* 564 (1997) and observing that " 'this Court will not render advisory opinions or exercise its jurisdiction in the abstract' "); *In re Camden County*, 170 *N.J.* 439, 448–49, 790 *A.2d* 158 (2002) (quoting *Crescent Park Tenants Ass'n, supra*, 58 *N.J.* at 107–08, 275 *A.2d* 433, for proposition that " '[u]nlike the Federal Constitution, there is no express language in New Jersey's Constitution [confining] our judicial power to actual cases and controversies. Nevertheless, we will not render advisory opinions or function in the abstract' ").

function operates best when a concrete dispute is presented to the

courts." *Ibid.; see also Grand Union Co. v. Sills*, 43 *N.J.* 390, 410, 204 *A.*2d 853 (1964) (noting "wholesome policy considerations which confine courts to actual controversies and dissuade them from rendering abstract or advisory opinions" (citing *Proprietary Ass'n v. Bd. of Pharmacy*, 16 *N.J.* 62, 72, 106 *A.*2d 272 (1954))).

The "concrete dispute" presented in this appeal is answered fully, completely and conclusively by resort to the *Rules of Evidence*, the conclusion the majority first advances and with which I concur. Anything further is unnecessary to that outcome and, in the exercise of restraint, should be rejected. In sum, if the res gestae doctrine is to be condemned, it should be when the doctrine itself is the issue on appeal, and not some collateral appendage to an opinion that stands squarely on its own without overreaching for a seemingly desired but plainly unnecessary result.

*For affirmance as modified*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS and STERN (temporarily assigned)—7.

*For concurrence in part; dissent in part*—Justices RIVERA–SOTO and HOENS—2.