**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3235-18T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAQUAN A. SUBER, a/k/a
AQUIL JAQUAN SUBER,

     Defendant-Appellant.

_____

Submitted October 19, 2020 — Decided December 11, 2020

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-12-1637.

Kathleen M. Theurer, attorney for appellant.

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Defendant appeals from his convictions following a jury trial, alleging several evidential errors and challenging the denial of his request for an adjournment of the trial to retain private counsel. After a review of the contentions in light of the record and applicable principles of law, we affirm.

We derive our facts from the evidence presented at trial. In September 2017, the Frate family lived on the main floor of a home. Defendant rented the downstairs apartment.

In the early morning hours of September 3, 2017, members of the Frate family smelled gas coming from defendant's apartment. They had also smelled gas several days earlier. Carol Frate and her son, Cody, unlocked the backdoor entrance to the apartment and went inside where they observed the gas stove was on without any flames. They also noticed a rope was tied to the door that connected defendant's apartment to the Frate's residence. The rope was hooked to a pillar and then to the stove; the end of the rope was in a liquid-filled bottle on the floor in front of the stove. The Frates turned the stove off and opened the outside door to air out the apartment. They went back into their home, taking the rope and the liquid-filled bottle it was in. Later, when Carol heard defendant return home, she went downstairs and told him he had to leave the apartment because of the recent incidents.

At around 5:00 a.m., Frate called the police. When two Fort Lee Police Department officers responded, Carol and Cody told the officers about defendant leaving the stove on twice and their safety concerns. The officers spoke with defendant, who admitted he left the stove on and had a dispute with Frate about leaving the apartment. The officers informed him of the dangers of leaving a gas stove on, but since the officers did not detect any odor of gas, they left.

Prior to these events, Cody had contacted Fort Lee Detective Dennis Conway regarding his stepbrother, Ronald, who had been missing for several days. Conway told him to call again the next day if Ronald had not returned. When Conway arrived at work on September 3, 2017, he learned Ronald was still missing. After learning Ronald had been arrested several days earlier and was incarcerated in the Bergen County jail, Conway and his partner, Detective Dennis Pothos, went to the Frates' home at 10:00 a.m. to give them the information.

After discussing Ronald's whereabouts, Carol told the detectives about the incidents that occurred hours earlier, describing the string tied to the stove with its other end in a liquid-filled bottle near the stove. Pothos told Frate they would speak with defendant to make sure he was alright.

3

The detectives exited the home and turned left down the driveway towards the backdoor of the downstairs apartment. Although the detectives were not in uniforms, their badges were displayed, and they were wearing shirts bearing the Fort Lee Police Department emblem. When defendant answered the door, he asked why they were there and whether they were going to arrest him. The detectives said they were not arresting him and just wanted to ask some questions.

Defendant first stated he could not recall leaving the stove on and then said he might have when he was cooking. When the detectives asked him whether he was mixing flammable fluids, defendant first said he could not remember and then said he might have because he was bored. Defendant denied tying a string to the stove.

As the detectives were speaking with defendant, Pothos noticed he was giving evasive answers and blocking access to the apartment. Pothos said "262" to Conway, which signaled a need to call a helpline telephone number. This telephone number gives Bergen County law enforcement the ability to speak with someone at Bergen Regional Medical Center and ask for guidance on how to handle certain situations involving individuals who may require mental health counseling. In some instances, a professional psychologist is sent out to speak

4

with the party or the officer may be directed to transport the individual to the medical center to be evaluated. Conway called the helpline and Pothos requested a marked unit.

When police officer Andrew Lakawicz arrived, defendant grew more agitated. Lakawicz was wearing a body microphone and the device was recording when Pothos repeated the questions he had asked defendant. Defendant gave similar responses—that he might have left the gas on accidentally while cooking, he might have been mixing fluids in a bottle, and that he did not tie a string to the stove.

Defendant refused to let Pothos perform a protective search of him and closed the storm door. Pothos and Lakawicz then entered the apartment and saw defendant grab a handgun from the top of the refrigerator and turn towards the officers. Pothos yelled that defendant had a gun and pushed Lakawicz outside. Pothos then positioned himself behind the detached garage. After taking cover, the officers drew their weapons as defendant stood in the doorway. A street camera recorded footage of defendant standing in the doorway pointing his gun at Pothos. The detective repeatedly asked defendant to put the gun down, saying he was there to help him.

Defendant closed the storm door and Pothos requested backup. When defendant re-opened the door, he again pointed his weapon at Pothos and the other officers on the scene. A neighbor on the second floor of his home recorded on his cell phone defendant pointing his gun at Pothos, Conway, and a third officer.

At one point, defendant left the doorway and the officers lost sight of him. The street camera recorded defendant standing near the garage pointing his gun at Pothos, who was in the back yard. Upon realizing this, Pothos immediately moved to the front yard.

Defendant also moved to the front yard and fired his weapon towards Pothos and two other officers. The three officers returned fire. Pothos's shot struck defendant, causing him to drop to the pavement. When defendant raised his gun again, Pothos discharged two more rounds. The shots struck defendant again and caused him to drop his weapon. Nevertheless, he got up and ran towards Pothos. Pothos kicked defendant in the stomach as he approached, and defendant took off towards the street. Pothos caught up to defendant and tackled him from behind. Other officers at the scene helped restrain defendant as he resisted arrest.

A-3235-18T4

Defendant was charged in an indictment with the following offenses: third-degree aggravated assault by pointing a firearm at a law enforcement officer, in violation of N.J.S.A. 2C:12-1(b)(9) (counts one through seven); fourth-degree aggravated assault with a firearm, in violation of N.J.S.A. 2C:12-1(b)(4) (counts eight and nine); first-degree attempted murder, in violation of N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1) (counts ten through twelve); third-degree resisting arrest, in violation of N.J.S.A. 2C:29-2(a)(3)(a) (count thirteen); second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a) (count fourteen); first-degree possession of a weapon without having obtained a permit, in violation of N.J.S.A. 2C:39-5(b) and 2C:39-5(j) (count fifteen); and second-degree possession of a firearm by a previously convicted person, in violation of N.J.S.A. 2C:39-7(b) (count sixteen). Counts eight and ten were later dismissed.

During a court proceeding on November 5, 2018, the court considered motions filed by defense counsel and defendant. Because of the pro se filings, the court inquired of defendant whether he intended to represent himself. Defendant replied no.

Defense counsel then advised the court that defendant wanted a different public defender. The judge responded: "We've been over this four times now

. . . . You've asked the Public Defender's Office to change your counsel. They've told you . . . no. You don't have the right to pick your attorney."

Defendant advised the court he had spoken to the "head public defender" and he was waiting for a response as to his request for a change of counsel. Defense counsel stated he too had spoken to the head of the office who stated that defendant could not "pick and choose his attorney. Either he can hire private counsel, he can continue with me or he can make an application to . . . go pro se . . . ."

The judge noted defendant had twice stated he did not wish to represent himself. He advised defendant that the Public Defender's Office was not going to assign him a new attorney. After ruling on the motions, the judge reminded the parties of the December 4, 2018 trial date and his expectation that jury selection would begin that day, with opening statements to occur immediately following the seating of a panel.

On Tuesday, December 4, the parties convened for trial. The court acknowledged the receipt of a letter from defendant the previous Thursday requesting to represent himself with standby counsel from the Public Defender's Office. Defendant had also submitted a number of motions on December 4.

After a review of the documents, the court concluded the motions were the same applications previously presented at the November 5 hearing.

The court advised defendant he would conduct a hearing to determine whether defendant was "exercising a knowing, intelligent and voluntary waiver of his right to counsel." In response, defendant said he wanted to retain private counsel.

The judge reminded defendant his trial was starting that day and the "time to retain a private attorney expired long ago." Defendant admitted he did not have a private attorney ready to begin that day, but he intended to retain one and needed an adjournment. He conceded he had not previously asked the court for the opportunity to retain private counsel.

Defense counsel informed the court he had spoken with the attorney defendant had contacted and learned that counsel was currently involved in a three-defendant murder trial in Passaic County. The potential new attorney said "he would consider getting involved [if] the [c]ourt . . . g[a]ve an extension of time." Defense counsel confirmed the Passaic County case had started two weeks earlier and he did not know when it was expected to conclude.

Because defendant had told the court previously that he did not wish to proceed pro se, the court asked him about his change of mind. Defendant stated

9

he had "evidence that [he] wanted to put into motions and [he] had case law[] [he] wanted to put in motions." The judge reminded defendant, as he had told him previously, that it was not appropriate to address the specific issues through pretrial motions. When the court asked again why he wanted to proceed pro se, defendant asserted defense counsel had not obtained records he asked him to obtain and had not retained any law enforcement witnesses to support his defense. Defendant also maintained there was a "severe breakdown" in communications with defense counsel.

After conducting a comprehensive hearing, the judge denied the application, finding it was made to delay the trial and the "alleged waiver was [not] . . . knowing and voluntary and intelligent." The judge found defendant was not capable of representing himself and further noted defendant conceded it was not in his best interest to represent himself.

The next morning, prior to the start of jury selection, the court denied defendant's request for an adjournment to retain private counsel. In his oral decision on December 5, 2018, the court stated:

> Yesterday for the first time defendant asked to adjourn the trial so that he could retain private counsel. Procedurally this trial was scheduled for . . . [December 4, 2018] on October 9[], 2018 and there was significant motion practice, in November I decided three motions that were filed by the defense. I never . . . heard a

request by . . . defendant to retain private counsel until . . . the day the trial was scheduled to start . . . . [I]t is my firm belief that this adjournment request, which was made at the very last minute, is merely an attempt to postpone the start of this trial.

[Defendant] waited until . . . the day of trial to . . . make the request for the first time. Defendant has experienced trial counsel assigned to defend him. Mr. Weichsel has decades of trial experience, I've seen him try cases in this . . . courtroom and he is . . . eminently qualified to . . . represent . . . defendant in this case and he is prepared to begin the trial.

From what I understand[,] . . . defendant has not actually retained private counsel. That he has contacted an attorney who might . . . some time in the future get involved in this case, but . . . certainly is not, for professional reasons as I understand it, not prepared or able to . . . participate in the trial at this time or[,] . . . as far as . . . we know[,] even in the . . . near future. We have no idea if that . . . counsel would actually become involved in the case.

What I do know for sure is that . . . changing counsel at this point would result in a very lengthy adjournment of the trial because . . . of the trial schedule that . . . I have through . . . 2019, but also because . . . the new counsel would need . . . time to prepare for trial.

So, for all of those reasons, most of all because the request for the adjournment was as untimely as . . . you could ever have, the request for an adjournment is denied.

The jury convicted defendant on fourteen counts. He was sentenced to an aggregate term of forty-five years in prison with a thirty and one-half-year period of parole ineligibility. This appeal followed.

Defendant presents the following issues for our consideration:

> POINT I. DEFENDANT'S REQUEST FOR AN ADJOURNMENT OF THE INITIAL TRIAL DATE, IN ORDER TO OBTAIN COUNSEL OF HIS CHOOSING, WAS IMPROPERLY DENIED.
>
> POINT II. INTRODUCTION OF OTHER CRIMES EVIDENCE DEPRIVED DEFENDANT OF A FAIR TRIAL.
>
> POINT III. THE COURT ERRED IN FAILING TO EVALUATE THE ADMISSIBILITY OF DEFENDANT'S OUT OF COURT STATEMENTS AS REQUIRED BY N.J.R.E. 104(C).
>
> POINT IV. REVERSAL IS REQUIRED BECAUSE THE STATE PRESENTED INADMISSIBLE LAY OPINION TESTIMONY THAT INCLUDED LAW ENFORCEMENT OFFICERS' OPINIONS REGARDING DEFENDANT'S GUILT AND INTENT.

In State v. Kates, 216 N.J. 393, 395-96 (2014), our Supreme Court established the analysis required to determine whether a defendant was deprived of his or her constitutional right to counsel of choice. The Court noted a defendant's right to counsel of choice was not absolute and could be balanced against the demands of a court's calendar. Id. at 396. The Court also instructed

A-3235-18T4

trial courts to consider the factors outlined in State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985) when assessing a defendant's request for a continuance to retain counsel.  Ibid.  Those factors include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case;
>
> [Furguson, 198 N.J. Super. at 402 (quoting U.S. v. Burton, 584 F.2d 485, 490-91 (1978).]

As the Appellate Division stated in State v. Kates, 426 N.J. Super. 32, 47 (App. Div. 2012), the deprivation of the right to choose counsel only occurs "when the court mistakenly exercises its discretion and erroneously or arbitrarily denies a continuance to retain chosen counsel."  "If a trial court conducts a reasoned, thoughtful analysis of the appropriate factors, it can exercise its authority to deny a request for an adjournment to obtain counsel of choice."

13

<u>Kates</u>, 216 N.J. at 396-97 (citations omitted). Further, "[t]rial judges retain considerable latitude in balancing the appropriate factors." <u>Id.</u> at 397 (citing <u>State v. Hayes</u>, 205 N.J. 522, 537-39 (2011)). As a result, trial judges "can weigh a defendant's request against the need 'to control [the court's] calendar and the public's interest in the orderly administration of justice.'" <u>Ibid.</u> (citing <u>Furguson</u>, 198 N.J. Super. at 402).

Defendant contends he requested an adjournment of the trial and time to hire private counsel on December 4, 2018. He asserts he contacted private counsel who informed him he could provide representation if the trial was adjourned.

Defendant recognizes the court engaged in a colloquy with him regarding the rights and responsibilities he would have if he proceeded pro se. However, defendant maintains the court decided the application without engaging in the requisite analysis of the <u>Furguson</u> factors. According to defendant, the court ignored his previous request to retain private counsel a month before trial. We are unpersuaded.

Before the long-scheduled trial day, defendant made several requests for the Public Defender's office to assign him a different public defender. The first

time he asked to retain private counsel was on December 4, 2018, the first day of jury selection.

As described above, the court addressed defendant's request for a different public defender on November 5, 2018. The court reiterated to defendant that he was previously informed that he did not have the right to choose a different assigned counsel. During the hearing, defense counsel noted the Public Defender's Office made clear defendant's options were to: hire private counsel; continue with defense counsel; or make an application to proceed pro se. At no time during this hearing did defendant request the opportunity to retain private counsel.

We are satisfied the trial judge did not mistakenly exercise his discretion in denying defendant's request for an adjournment. In his oral decision, the judge thoughtfully analyzed the appropriate factors and considered the demands of his calendar.

In addressing the Furguson factors, the judge found: a lengthy delay was likely because the court had a busy trial schedule and replacement counsel had not been retained yet; the court firmly believed the request was purposefully made to postpone trial; defendant did not ask to retain private counsel until the first day of trial; and, since replacement counsel had not yet been retained, "other

competent counsel [was not] prepared" to begin trial.  In addition, the court noted that changing counsel "would result in a very lengthy adjournment of the trial because . . . of the trial schedule . . . through . . . 2019, but also because . . . the new counsel would need . . . time to prepare for trial."  We discern no error in the denial of an adjournment under these circumstances.

Defendant's challenge of several evidential issues also lacks merit.  He asserts first that it was error to permit testimony regarding his actions of leaving the gas stove on and mixing flammable fluids because it was impermissible prior bad act evidence.  Defendant contends the court failed to conduct the requisite Cofield[1] and N.J.R.E. 404(b) analyses.

Defendant did not request those analyses nor object to the testimony.  We review therefore for plain error, only reversing if the error is "clearly capable of producing an unjust result."  R. 2:10-2.

Rule 404(b) provides that

> evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

---

[1]  State v. Cofield, 127 N.J. 328 (1992).

Cofield established a four-pronged test to determine the admissibility of evidence under the rule.

Defendant was not charged with any crimes relating to the flammable liquids or gas discharge. The testimony was not presented to show defendant was predisposed to commit a crime. Instead it was introduced as Pothos narrated the sequence of events – what led the detectives to defendant's apartment and what occurred thereafter. Moreover, there was ample evidence to support defendant's convictions. The references to the gas stove do not constitute plain error.

During the trial, the State played several statements made by defendant during the confrontation with police.[2] The statements were recorded on

---

[2] In the video, defendant is heard making the following statements:

> [Defendant]: Please don't, man. I'm not fucking playing with you.
>
> . . . .
>
> [Defendant]: . . . You shoot a[t] me, I'm shooting at you.
>
> . . . .
>
> [Defendant]: I'm not fucking playing with you. I'm not fucking playing with you all.

Lakawicz's body microphone. There was no objection to the statements. On appeal, defendant contends that because the recorded statements were made without advisement of his Miranda[3] rights, the court should have conducted a N.J.R.E. 104 hearing to assess the voluntariness of the inculpatory statements. We disagree.

When the detectives first spoke with defendant at his apartment door, he conceded he was mixing flammable fluids. As discussed above, this was not an inculpatory statement because defendant was not charged with any offenses related to that conduct. In addition, that statement and the other recorded statements were made by defendant during the confrontation with police as he was pointing a gun and shooting at the officers. As defendant was not yet under arrest, the requirement to apprise him of his Miranda rights was not triggered. See Rhode Island v. Innis, 446 U.S. 291, 300-302 (1980) ("We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). Therefore, there was no need for a Rule 104 hearing.

In turning to defendant's final argument, he contends the State elicited lay opinion testimony from several officers, in violation of N.J.R.E. 701. He refers

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

to the following trial testimony: Pothos's description of defendant being "bladed" and his explanation of the term; Officer Gabriel Avella's testimony that defendant pointed his gun at him and wanted to kill him; Pathos's statement that defendant was "actively resisting" arrest; and Officer Kelsey Ford's detailed description of what went through her mind after hearing a gunshot, her statement when shown a photograph that defendant is aiming his weapon at the officers in the picture photograph, and her testimony that after defendant was restrained, she had "to get [her] EMT bag to save the person who just tried to murder [her] . . . ."

Defendant argues the testimony was impermissible because the statements expressed opinions that defendant was guilty of the charged crimes. He asserts the officers' testimony was clearly capable of producing an unjust result and deprived him of his right to a fair trial.

Because defendant only objected to the Avella statement, we review the others for plain error. We review the trial court's admission of the Avella statement for an abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011).

Lay opinion testimony is permitted under Rule 701 if it is "based on the perception of the witness and . . . will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). A careful review of the statements

reveals they were the respective officer's personal observations and perception. Each of the officers testified to events during which they were present. The officer's statements described their perceptions of defendant's actions as he was running towards them, pointing a gun, and shooting at them. We discern no error in the testimony.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3235-18T4